ACCEPTED
15-25-00036-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
6/30/2025 6:29 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00036-CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
6/30/2025 6:29:00 PM
CHRISTOPHER A. PRINE
Clerk

In the Court of Appeals
Fifteenth Court of Appeals District

**JORGE R. GUEVARA, M.D.,**
*Appellant*

*v.*

**TEXAS MEDICAL BOARD,**
*Appellee*

On Appeal from Cause No. D-1-GN-23-007371
In the 353rd Judicial District Court, Travis County
The Honorable Sherine Thomas, Judge Presiding

**APPELLANT'S BRIEF**

Jason Davis
State Bar No. 00793592
E-mail: *jdavis@dslawpc.com*
Hayley Ellison
State Bar No. 24074175
E-mail: *hellison@dslawpc.com*
DAVIS & SANTOS, PLLC
719 S. Flores Street
San Antonio, Texas 78204
Tel: (210) 853-5882
Fax: (210) 200-8395

*Attorneys for Appellant*

***ORAL ARGUMENT <u>NOT</u> REQUESTED***

# Identity of Parties and Counsel

| Appellant: | Appellate Counsel: |
|---|---|
| Jorge R. Guevara, M.D. | Jason Davis<br>E-mail: *jdavis@dslawpc.com*<br>Hayley Ellison, *Lead Counsel*<br>E-mail: *hellison@dslawpc.com*<br>DAVIS & SANTOS, PLLC<br>719 S. Flores Street<br>San Antonio, Texas 78204<br>Tel.: (210) 853-5882 |
| | **Trial Counsel:** |
| | John J. Rivas<br>Ethan Yat Fai Lau<br>RIVAS GOLDSTEIN, LLP |
| **Appellee:** | **Trial and Appellate Counsel:** |
| Texas Medical Board | Kathy Johnson<br>E-mail: *Kathy.Johnson@oag.texas.gov*<br>Ted Ross<br>E-mail: *Ted.Ross@oag.texas.gov*<br>OFFICE OF THE ATTORNEY GENERAL<br>P.O. Box 12548<br>Austin, Texas 78711<br>Tel.: (512) 475-4191 |

# Table of Contents

Identity of Parties and Counsel ................................................................... 2

Table of Contents ....................................................................................... 3

Index of Authorities ................................................................................... 6

Statement of the Case ................................................................................. 8

Statement Regarding Oral Argument ........................................................... 9

Note Regarding References to the Administrative Record ........................... 10

Issues Presented ...................................................................................... 11

Statement of Facts .................................................................................... 13

    I.       Dr. Guevara is a family physician and small business owner. .......... 13

    II.     The State investigated and assessed penalties against MAB and
           the physician in charge of its radiology department—not
           Dr. Guevara. ..................................................................................... 14

    III.    The Texas Medical Board imposed professional discipline on
           Dr. Guevara for conduct unrelated to his medical practice. ............. 15

    IV.    The trial court affirmed the improper final agency decision. ............ 17

Summary of the Argument ........................................................................ 17

Argument ................................................................................................. 19

    I.       Standard of review. ........................................................................... 19

    II.     The TMB abused its discretion by exceeding the scope of its
           disciplinary authority under the Medical Practice Act. .................... 19

A. The TMB has authority to regulate the practice of medicine only—nothing more. ......................................... 20

B. The TMB abuses its discretion if it exceeds its regulatory mandate. ....................................................... 20

C. The TMB abused its discretion by disciplining Dr. Guevara for conduct unconnected to the practice of medicine. ................................................................ 22

    i. Dr. Guevara's conduct as an RSO was not connected with the practice of medicine in a manner likely to deceive or defraud the public......... 25

    ii. Dr. Guevara's conduct as a business owner was not connected with the practice of medicine in a manner likely to deceive or defraud the public.. 26

III. The TMB's finding of lack of diligence is not supported by substantial evidence and is therefore arbitrary and capricious. ......... 30

IV. The TMB's imposition of penalties is unreasonable, arbitrary, and capricious. ........................................................ 33

Conclusion and Prayer ............................................................. 35

Certificate of Compliance ......................................................... 37

Certificate of Service .............................................................. 37

Appendix:

Tab A: Final Order on Plaintiff's Original Petition (*CR 379–80*)

Tab B: Agency Final Decision (*CR 33–45*)

Tab C: *Aleman v. Tex. Med. Bd.*, 573 S.W.3d 796 (Tex. 2019)

Tab D: TEX. OCC. CODE § 164.051

Tab E: TEX. OCC. CODE § 164.052

Tab F: TEX. OCC. CODE § 164.053

# Index of Authorities

## Cases

*Aleman v. Tex. Med. Bd.*,
   573 S.W.3d 796 (Tex. 2019) ...............................................................*passim*

*Baptist Mem'l Hosp. Sys. v. Sampson*,
   969 S.W.2d 945 (Tex. 1998) .....................................................28, 29

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
   375 F.3d 1182 (D.C. Cir. 2004).................................................33, 35

*Miller v. R.R. Comm'n*,
   363 S.W.2d 244 (Tex. 1962) ............................................................ 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................ 33

*Park Haven, Inc. v. Tex. Dep't of Hum. Servs.*,
   80 S.W.3d 211 (Tex. App.—Austin 2002, no pet.)..................................... 19

*Save Our Springs All., Inc. v. TCEQ*,
   No. 23-0282, 2025 WL 1085176 (Tex. Apr. 11, 2025) (slip op.)................. 31

*Tex. Dep't of Ins. v. State Farm Lloyds*,
   260 S.W.3d 233 (Tex. App.—Austin 2008, no pet.)............................33, 35

*Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*,
   665 S.W.2d 446 (Tex. 1984) ............................................................ 31

**Statutes**

TEX. BUS. ORGS. CODE § 301.012 ..................................................................... 27

TEX. GOV'T CODE §§
  2001.141.............................................................................................................. 31
  2001.174.........................................................................................................19, 30

TEX. OCC. CODE §§
  151.002 .........................................................................................................20, 25
  151.003 .............................................................................................................. 30
  152.001 .............................................................................................................. 20
  164.051 .........................................................................................................*passim*
  164.052 .............................................................................................................. 16
  164.053 .........................................................................................................16, 22

**Regulations**

22 TEX. ADMIN. CODE § 190.8 ......................................................................... 16

25 TEX. ADMIN. CODE § 289.252 ..................................................................14, 25

## Statement of the Case

*Nature of the Case:*      This is an appeal from an administrative decision of the Texas Medical Board ("TMB"). *CR 4.* The TMB issued a final agency decision imposing professional discipline on Appellant, a physician. *CR 33.* After exhausting his administrative remedies, Appellant sought judicial review in the trial court. *CR 4.*

*Trial Court:*      353rd Judicial District Court, Travis County
The Honorable Sherine Thomas, Judge Presiding

*Course of Proceedings:*      The trial court considered the administrative record and the parties' briefs on the merits. *See CR 379–80.*

*Trial Court's Disposition:*      The trial court affirmed the TMB's final agency decision in all respects. *CR 380.*

## Statement Regarding Oral Argument

Because the legal and factual issues in this appeal are straightforward, Appellant does not believe oral argument would be helpful to the Court. If the Court decides to grant oral argument, Appellant respectfully requests an opportunity to attend and present argument.

## Note Regarding References to the Administrative Record

The TMB hand-filed the Administrative Record in the trial court on a flash drive. *CR 206.* Appellant designated the flash drive for inclusion in the Clerk's Record, but it was omitted. *CR 396 (item #8).* Appellant requested that the District Clerk supplement the Clerk's Record with the flash drive, and the District Clerk requested that Appellant obtain an order from the trial court directing her to do so. Appellant's motion to direct the District Clerk to transfer the flash drive to this Court is pending in the trial court.

The Administrative Record contains six PDF files:

(1) a certification and table of contents

(2) a redacted, Bates-labeled copy of the administrative record

> **Cited:** *AR at [Bates-labeled page #]*

(3) the transcript of the Hearing on the Merits

> **Cited:** *AR HOM at [page:line]*

(4) the TMB's exhibits

> **Cited:** *AR TMB Ex.[#] at [Bates-labeled page #]*

(5) Appellant's exhibits

> **Cited:** *AR Guevara Ex.[#] at [Bates-labeled page #]*

(6) post-hearing filings

## Issues Presented

1.    The Administrative Procedures Act ("APA"), which governs courts' review of final agency decisions, requires reversal of an agency order if the agency abused its discretion in making it. The Supreme Court of Texas has held an agency abuses its discretion by professionally disciplining a physician without express statutory authority to do so. The TMB has authority to discipline a physician for conduct connected with his practice of medicine that is likely to deceive or defraud the public. Here, however, the TMB disciplined Appellant Dr. Jorge R. Guevara, M.D. for conduct wholly unrelated to his practice of medicine. *Did the trial err by affirming the TMB's final order because it imposes discipline beyond its delegated authority to do so?*

2.    The APA requires every final agency decision to include findings of fact that are clear, specific, non-conclusory, and supportive of the ultimate statutory findings. An agency order that does not include such findings is unsupported by substantial evidence and must be set aside. Here, the TMB found Dr. Guevara responsible for failing to use proper diligence in his professional practice but did not even attempt to describe the facts supporting that conclusory finding in its final order. *Did the trial court err by affirming the TMB's final order because it is unsupported by substantial evidence?*

3.    The APA requires courts to hold unlawful and set aside any agency decision that is arbitrary or capricious. An agency decision is arbitrary and capricious if, for example, the agency reached an unreasonable result. Here, the TMB barred Dr. Guevara from owning, operating, or being associated in any way with any radiology program, even though this case only involved mammography. This result is unreasonable because it would force Dr. Guevara to divest from the radiology department of his business despite there being no allegation that Dr. Guevara committed misconduct related to radiology generally. *Did the trial court err by affirming the TMB's final order because it is arbitrary, capricious, and unreasonable?*

## Statement of Facts

**I.       Dr. Guevara is a family physician and small business owner.**

Dr. Guevara has been a licensed Texas physician since 1995. *CR 186 (citing AR TMB Ex. 42 at TMB0001815).* He is board-certified in internal medicine and substance abuse. *CR 186 (AR TMB Ex. 42 at TMB0001814).*

For the last twenty years, Dr. Guevara has owned Medical Associates of Brownsville, PA ("MAB"), a licensed, multi-discipline medical office serving underprivileged patients in historically underserved communities. *CR 186–87 (citing AR TMB Ex. 42 at TMB0001819, 29).* MAB's practice includes: (1) radiology (including mammography), (2) a family practice, (3) physical therapy, and (4) a sleep center. *CR 187 (citing AR Guevara Ex. R-1).* Each of these four departments is managed independently by its respective staff. *Id.* At all times, Dr. Guevara worked in the family practice department providing family medicine services. *Id.*

In addition to his family medicine practice, Dr. Guevara is the radiology department's Radiation Safety Officer ("RSO"). *CR 187 (citing AR TMB Ex. 42 at TMB0001831).* The RSO is responsible for the use, handling, and storage of radioactive materials, and his primary function is to prevent accidental radiation exposure. *CR 187.* The RSO's duties also include establishing and overseeing the

department's safety, emergency, and other procedures to prevent accidental exposure, as well as conducting surveys of and investigations into occupational radiation exposure. *CR 187* (citing 25 TEX. ADMIN. CODE § 289.252(f)(3)).

Although Dr. Guevara is a physician, the RSO need not be, and Dr. Guevara did not practice medicine in his role as RSO. *CR 187–88; see also* 25 TEX. ADMIN. CODE § 289.252(f) (RSO qualification requirements). The RSO is not authorized to implement quality assurance and control policies for the radiology department. *CR 187–88.* The RSO also does not assess image quality for readability or to ensure compliance with applicable standards. *Id.*

Kimberly Barner was the manager of MAB's radiology department and oversaw the department's business operations during the period relevant to this case. *CR 187 (citing AR TMB Ex. 42 at TMB0001837–44, AR TMB Ex. 44 at TMB0002055).* Dr. Allan Kapilivsky was the lead interpreting physician and was responsible for interpreting mammogram images, supervising technicians, and ensuring compliance with quality assurance/control policies and laws. *Id.*

## II. The State investigated and assessed penalties against MAB and its physician in charge—not Dr. Guevara.

On January 10, 2019, the Texas Department of State Health Services ("DSHS") inspected MAB's radiology department. *CR 188 (citing AR TMB Ex. 44 at TMB0002054–55).* DSHS identified several deficiencies related to quality

14

assurance and control and technician screening processes related solely to mammography. *Id.* No deficiencies were identified for other imaging studies. *Id.*

DSHS initiated an investigation into MAB and Dr. Kapilivsky (the "DSHS Case"). *CR 188; see also Tex. Dept. of State Health Servs. v. Med. Assocs. of Brownsville, PA*, No. 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. Following an administrative hearing, an ALJ recommended finding MAB and Dr. Kapilivsky in violation of several administrative regulations. *CR 188–89 (citing AR TMB Ex. 44 at TMB0002058–59), CR 120.* DSHS adopted the ALJ's findings of fact and conclusions of law and assessed an administrative penalty, which MAB promptly paid. *CR 189 (citing AR TMB Ex. 44 at TMB0002061–62).* Dr. Guevara was not individually a party to the DSHS Case and was not found personally responsible for any violations. *CR 188–89.*

### III. The Texas Medical Board imposed professional discipline on Dr. Guevara for conduct unrelated to his medical practice.

The TMB nevertheless filed a complaint with the State Office of Administrative Hearings against Dr. Guevara based on the identical issues adjudicated in the DSHS Case. *CR 189 (citing AR at TMB0000002).* After an administrative hearing, the ALJ found Dr. Guevara committed four violations of the Medical Practice Act:

15

(1) engaging in unprofessional conduct that was likely to deceive or defraud the public by committing acts that (a) violated the regulations governing mammography providers and their RSOs and (b) were connected to Dr. Guevara's practice of medicine (TEX. OCC. CODE §§ 164.051(a)(1), .052(a)(5), .053(a)(1));

(2) engaging in unprofessional conduct that was likely to deceive or defraud the public by failing to adequately supervise the activities of employees under his supervision (TEX. OCC. CODE §§ 164.051(a)(1), .052(a)(5), .053(a)(8));

(3) engaging in unprofessional conduct that was likely to deceive or defraud the public by delegating professional medical responsibility or acts to a person he knew or had reason to know was not qualified to perform those responsibilities or acts (TEX. OCC. CODE §§ 164.051(a)(1), .052(a)(5), .053(a)(9)); and

(4) failing to use proper diligence in his professional practice, which constitutes a failure to practice in an acceptable manner consistent with the public health and welfare (TEX. OCC. CODE § 164.051(a)(6); 22 TEX. ADMIN. CODE § 190.8(1)(C)).

*CR 189 (citing AR at TMB0001091); see also CR 40 ¶¶ 6–9.* The TMB adopted the ALJ's findings of fact and conclusions of law and signed a final order on August 18, 2023. *CR 190 (citing AR at TMB0001213–26), CR 33.* That final order is the final agency decision.

The final order, among other things, bars Dr. Guevara from owning, operating, acting as an RSO or medical director for, or otherwise being associated with any imaging program, including any facility where imaging studies are performed or interpreted. *CR 190 (citing AR at TMB0001220–21), CR 40–41.* The final order expressly bars Dr. Guevara from affiliation with all

16

categories of imaging practice, including x-rays, sonagrams, CT scans, MRIs, and all other diagnostic studies, even though none of these imaging practices were the subject of or adjudicated in the DSHS Case or this case. *CR 190 (citing AR at TMB0001220–21), CR 40–41.*

Dr. Guevara filed a motion for rehearing, which the TMB summarily denied. *CR 190 (citing AR at TMB0001212).*

### IV. The trial court affirmed the improper final agency decision.

Having exhausted his administrative remedies, Dr. Guevara filed suit in the trial court. *CR 4.* The trial court signed a final judgment affirming the final agency decision. *CR 379.*

Dr. Guevara filed a motion for new trial, which was overruled by operation of law. *CR 385.* Dr. Guevara timely appealed. *CR 392.*

## Summary of the Argument

The legislature authorized the TMB to regulate and discipline Texas physicians in connection with the practice of medicine. Here, however, the TMB imposed discipline on a physician for conduct wholly unrelated to the practice of medicine. The trial court erred by ratifying the TMB's order exceeding the bounds of its delegated authority.

17

The TMB's final order is also unsupported by substantial evidence and is arbitrary, capricious, and unreasonable. The APA requires every agency decision to be supported by findings of fact that are clear, specific, and non-conclusory. This is more than a technical prerequisite; fulsome findings of fact enable citizens to intelligently prepare and present an appeal to the courts and assist courts in properly exercising their reviewing role.

The TMB stripped Dr. Guevara of a significant piece of his business without anything more than bald, conclusory statements that he was not diligent in his medical practice. Those conclusions are particularly incredible given that all the misconduct alleged concerned Dr. Guevara's role as a business owner and RSO—not as a physician. The trial court erred by affirming the TMB's unreasonable order without even the benefit of proper findings of fact to support that order.

Finally, the TMB imposed sweeping, unreasonable sanctions barring Dr. Guevara from even being affiliated with imaging practices wholly unrelated to the conduct at issue in this case and in the DSHS Case, both of which exclusively concerned mammography. The TMB's sanctions are wholly untethered from the conduct they purport to redress and are therefore arbitrary, capricious, and unreasonable.

18

This Court should reverse and vacate the TMB's final order in its entirety because it is an abuse of discretion, unsupported by substantial evidence, and arbitrary and capricious.

## Argument

### I.    Standard of review

The APA governs courts' review of final agency decisions. *See* TEX. GOV'T CODE § 2001.174; *Park Haven, Inc. v. Tex. Dep't of Hum. Servs.*, 80 S.W.3d 211, 213 (Tex. App.—Austin 2002, no pet.). Under the APA framework, a reviewing court "shall" reverse a final agency decision if its findings of fact and conclusions of law are "not reasonably supported by substantial evidence" or "arbitrary or capricious or characterized by abuse of discretion." TEX. GOV'T CODE § 2001.174(2)(E), (F); *Aleman v. Tex. Med. Bd.*, 573 S.W.3d 796, 801 (Tex. 2019).

### II.    The TMB abused its discretion by exceeding the scope of its disciplinary authority under the Medical Practice Act.

A reviewing court must reverse an agency order if the agency abused its discretion in rendering its findings and conclusions. *See Aleman*, 573 S.W.3d at 801 (citing TEX. GOV'T CODE § 2001.174(2)(F)). The Supreme Court of Texas has held the TMB abuses its discretion by disciplining a physician without statutory authority to do so. *See id.* at 806. That is what happened here.

**A.** **The TMB has authority to regulate the practice of medicine only and nothing more.**

The Medical Practice Act grants the TMB "the power to regulate the practice of medicine." *Id.* at 802 (citing TEX. OCC. CODE § 152.001(a)). The Act defines "practicing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a [physician]." TEX. OCC. CODE § 151.002(13).

The Act also specifically authorizes the TMB to take disciplinary action against a physician who engages in statutorily prohibited conduct, including "unprofessional or dishonorable conduct that is likely to deceive or defraud the public." TEX. OCC. CODE § 164.052(a)(5); *Aleman*, 573 S.W.3d at 802 (citing TEX. OCC. CODE § 164.051(a)). Section 164.053 of the Act contains a laundry list of such conduct, including "an act that violates any state or federal law *if the act is connected with the physician's practice of medicine*." TEX. OCC. CODE § 164.053(a)(1) (emphasis added).

**B.** **The TMB abuses its discretion by exceeding its regulatory mandate.**

The Supreme Court of Texas addressed section 164.053(a)(1) in the seminal *Aleman* decision. In that case, the TMB disciplined Dr. Aleman for

signing a death certificate with a pen in violation of a state law requiring all such certifications to be signed electronically. *Aleman*, 573 S.W.3d at 802. Dr. Aleman did not dispute that he violated the state law but challenged the TMB's authority to professionally discipline him for that violation. *Id.*

Interpreting section 164.053's laundry list of actions "likely to deceive or defraud the public," the supreme court concluded a violation of state or federal law is subject to disciplinary action by the TMB *only if* the act is "connected with the practice of medicine in a manner that makes it likely to deceive or defraud the public." *Id.* at 804.

Based on this reading of the Act, the court held the fact that Dr. Aleman signed the death certificate in his capacity as the decedent's physician was not sufficient to warrant discipline, since even conduct connected with the practice of medicine is not wrongful unless it performed "in a manner that makes it likely to deceive or defraud the public." *Id.* The court concluded signing a death certificate with a pen rather than electronically clearly is not likely to deceive or defraud the public because the manner of signing has no bearing on the accuracy of the information in the certificate. *Id.* at 805.

The court also criticized the TMB's "overly broad interpretation" of its own authority to impose discipline. *Id.* To illustrate the absurdity of the TMB's

sweeping view of its own powers, the court posed the following hypothetical: "[S]uppose a physician were cited for speeding while on the way to the hospital to deliver a baby. The physician has likely violated a state law . . . [that] is at least arguably 'connected with' his practice of medicine." *Id.* at 805–06. But disciplining such conduct would be inconsistent with both the Act's language and its purpose, which does not include conduct "in no way connected with the practice of medicine in a manner that makes the act likely to deceive or defraud the public[.]" *Id.* at 806.

### C. The TMB exceeded its authority by disciplining Dr. Guevara for conduct in no way connected with the practice of medicine.

The TMB disciplined Dr. Guevara for three alleged acts the TMB claims were "likely to deceive or defraud the public": (1) committing an unlawful act in connection with the practice of medicine; (2) failing to supervise those under the physician's supervision; and (3) delegating professional medical responsibility or acts to a person the physician knows is not qualified to perform the responsibility or acts. *CR 40 ¶¶ 6–8* (citing TEX. OCC. CODE § 164.053(a)(1), (8), (9)). The TMB based its final agency decision on the ALJ's findings and conclusions. *CR 33.*

Importantly, the ALJ based her findings and conclusions largely on the findings and conclusions reached in the DSHS Case, reciting them verbatim in her own proposal for decision. *CR 34–37 ¶¶ 8–9.* The ALJ concluded the DSHS findings "have preclusive, collateral estoppel effect against Dr. Guevara in this case." *CR 40 ¶ 5.* But Dr. Guevara was not an individual party to the DSHS Case and was not personally disciplined for any conduct found in that case. *CR 188–89 (citing AR at TMB0002061–62), CR 120.*

Even to the extent Dr. Guevara is bound by the DSHS findings, they overwhelmingly do not address his conduct. DSHS's finding of fact 20 is the only express reference to Dr. Guevara in those findings:

> DSHS FOF 20: As MAB's radiation safety officer, Dr. Guevara failed to ensure that facility personnel were adequately trained and complying with regulations. Dr. Guevara failed to ensure that Mr. Lugo was trained and qualified to work as a mammography technologist, and Dr. Guevara failed to ensure that Dr. Kapilivsky was performing the duties of a lead interpreting physician involving quality assurance and control.

*CR 36 ¶ 8 (DSHS FOF 20).* This finding is explicitly based on Dr. Guevara's acts and omissions as the radiology department's RSO—not as MAB's owner or as a physician practicing medicine. *See CR 36 ¶ 8 (DSHS FOF 20).*

The ALJ nevertheless recommended that the TMB professionally discipline Dr. Guevara *as a physician* based solely upon the conduct found in the

23

DSHS Case. *See CR 40 ¶¶ 5–9.* The TMB agreed and imposed professional discipline on Dr. Guevara for his purported acts as the radiology department's RSO and as the owner of MAB. *CR 40–43.*

But as the supreme court made clear in *Aleman*, the TMB had no authority to discipline Dr. Guevara for acts unrelated to the practice of medicine. *See* 573 S.W.3d at 804. Importantly, the mere fact that Dr. Guevara is a physician is immaterial if the conduct for which he is disciplined is not "*connected with the practice of medicine* in a manner that makes it likely to deceive or defraud the public." *See Aleman*, 573 S.W.3d at 804 (emphasis added) (rejecting the TMB's contention that certifying a death certificate in his capacity as the decedent's physician was a sufficient connection to the physician's practice of medicine).

The only misconduct found by DSHS that is even arguably attributable to Dr. Guevara is conduct in his role as RSO for the radiology department and as owner of MAB. Because none of that conduct is connected with Dr. Guevara's practice of medicine, the TMB lacked the statutory power to impose discipline in this case.

### i. Dr. Guevara's conduct as an RSO was not connected with the practice of medicine in a manner likely to deceive or defraud the public.

The ALJ found Dr. Guevara's failings as the radiology department's RSO were likely to deceive or defraud the public "because patients received mammograms from unqualified staff, performed in a facility with inadequate quality control and quality assurance, resulting in images of such poor quality that they were useless as a cancer screening tool." *CR 38 ¶ 21*.

As an initial matter, this finding misunderstands the role of an RSO. By definition, an RSO need not be a physician. *See* 25 TEX. ADMIN. CODE § 289.252(f) (a person is qualified to be an RSO if he has a high school diploma or equivalent, completes a basic training course, and has some training or experience in radiation safety). The RSO position is a strictly technical and ministerial one that deals exclusively with the use, handling, and storage of radioactive materials. *See id*. An RSO does not determine who is qualified to perform mammograms, nor does he diagnose and treat ailments. *See id.; see also* TEX. OCC. CODE § 151.002(13) (defining "practicing medicine").

The ALJ's conclusory finding that "Dr. Guevara's violations of law in his capacity as RSO for MAB were connected with his practice of medicine in a

manner that was likely to deceive or defraud the public" is therefore wholly untethered from the undisputed facts. *CR 39 ¶ 23.*

Further, even accepting DSHS's finding that Dr. Guevara was deficient as RSO, that deficiency is not connected with the practice of medicine in a manner likely to deceive or defraud the public. Just like signing a death certificate with a pen did not deceive or defraud the public as to the certificate's contents in *Aleman*, none of the ALJ's findings demonstrate Dr. Guevara's failings related to the use, handling, or storage of radioactive materials were (1) connected with his practice of medicine, or (2) likely to deceive or defraud the public in connection with that practice. *See* 573 S.W.3d at 805.

### ii. Dr. Guevara's conduct as a business owner was not connected with the practice of medicine in a manner likely to deceive or defraud the public.

Although the ALJ did not expressly find that Dr. Guevara's alleged failings as MAB's owner were likely to deceive or defraud the public in connection with his practice of medicine, the overall gist of the ALJ's findings is that Dr. Guevara was ultimately responsible for MAB's operations. For instance, the ALJ found:

- "*Given his roles as owner of MAB*, RSO for the radiology department, and his patients' referring physician, Dr. Guevara was uniquely positioned to know of the deficiencies in MAB's radiology department and to understand he was placing his patients at risk by referring them to MAB for mammograms."

- "Dr. Guevara failed to adequately supervise *his employees* in MAB's radiology department. . . ."

- "Dr. Guevara should have known that MAB had hired an unqualified radiology tech (Mr. Lugo). That Dr. Guevara delegated MAB's hiring decisions to an office manager does not absolve him of responsibility, *as owner* and physician, for the office manager's lapses."

*CR 38–39 ¶¶ 22, 24, 25* (emphases added).

MAB is responsible for the failings of its various departments and employees, and DSHS sanctioned MAB for those failings. *CR 189 (citing AR at TMB0002061–62).* But owning the parent company of a medical practice like MAB is not intrinsically connected with the owner's practice of medicine. In fact, one need not even be a physician to own or co-own a medical practice in all cases. *See, e.g.,* Tex. Bus. Orgs. Code § 301.012 (allowing, for instance, physician assistants to obtain minority ownership interests in medical practices).

Further, nothing in the Medical Practice Act or the Administrative Code provides that all deficiencies of a medical office are automatically imputed to its owner, even if he or she is a physician. Similarly, an owner of a medical practice is not automatically liable for a physician's malpractice. *See Baptist Mem'l Hosp.*

27

*Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998) (holding medical practice is generally not vicariously liable for the negligence of physicians who, rather than the practice, have the right to control the means and methods of their own work).

In this case, the DSHS findings demonstrate the radiology department's failures that were connected with the practice of medicine were attributable to Dr. Kapilivsky. *See CR 35 ¶ 8 (DSHS FOF 14); CR 194 (citing AR HOM at 60:2–15).* For example, DSHS found:

> DSHS FOF 14: As the lead interpreting physician, Dr. Kapilivsky was responsible for quality assurance tasks. Dr. Kapilivsky failed to document the mammography technologist's quality control test results for two quarters and failed to determine the mammography technologist's qualifications to perform quality assurance tasks.

> DSHS FOF 17: MAB failed to maintain a quality assurance program. Dr. Kapilivsky failed to maintain the program and ensure requirements were met. In particular, Dr. Kapilivsky failed to review the program on a quarterly basis and inform the technologist of deficiencies, and he failed to closely examine images, identify when images were unacceptable, and address images of deficient quality.

*CR 35 ¶ 8 (DSHS FOF 14, 17).* Neither DSHS nor the ALJ in this case found that Dr. Guevara assumed or asserted any responsibility for those tasks.[1]

---

[1] Although Dr. Kapilivsky tried to downplay his supervisory duties, he admitted he gave direct feedback to the technologists regarding image clarity and positioning and did not discuss any issues with particular patients with Dr. Guevara or the radiology department's office manager. *CR 198 (citing AR HOM at 56:6–57:3).* Dr. Kapilivsky also acknowledged that Dr. Guevara is not a radiologist, was never trained to read mammography, and never read

28

TMB's decision to professionally discipline Dr. Guevara for the conduct underlying the DSHS Case appears to be entirely based on the ALJ's wholly conclusory finding that "Dr. Guevara's medical practice at MAB and MAB's radiology department are both part of Dr. Guevara's professional practice." *CR 38 ¶ 13*. But how could radiology be part of Dr. Guevara's medical practice if it is undisputed that he did not practice medicine in the radiology department? *See CR 198 (citing AR HOM at 57:16–58:16).*

The practical—and potentially far-reaching—impact of the TMB's conclusion is that every physician-owner of a multi-department medical practice is subject to professional discipline for any deficiencies in any department, regardless of whether the physician actually practiced medicine in that (or any other) department. This conclusion flies in the face of the "connected with medical practice" requirement written into the Medical Practice Act and analyzed by the supreme court in *Aleman.* If adopted by this Court, the TMB's position would greatly and impermissibly expand the TMB's enforcement authority far beyond what the legislature envisioned.

---

films for MAB. *CR 198 (citing AR HOM at 57:16–58:16).* Assessing imaging quality and supervising technologists was Dr. Kapilivsky's job. *CR 198 (citing AR HOM at 57:16–58:16); see also CR 35 ¶ 8 (DSHS FOF 14).*

For instance, under the TMB's interpretation of its own authority, any passive physician owner of a medical clinic would be subject to professional discipline for any mistake made by the physicians actually operating that clinic. Similarly, all the physician owners of a physician-owned hospital would be subject to professional discipline for a single mistake made by a single physician practicing anywhere in the hospital system. That would be absurd.

The purpose of sections 164.052 and 164.053 of the Occupations Code is quintessentially to ensure public safety. *See* TEX. OCC. CODE § 151.003(1). That purpose is not to bestow upon TMB the unfettered authority to discipline physicians even when they are not actually practicing medicine. *See id.* Because the TMB lacked statutory authority to impose discipline for violations of Occupations Code sections 164.051(a)(1), 164.052(a)(5), and 164.053(a)(1), (8), and (9), it abused its discretion. *See Aleman*, 573 S.W.3d at 804–06.

## III. The TMB's finding of lack of diligence is not supported by substantial evidence and is therefore arbitrary and capricious.

A reviewing court must reverse an agency order if the agency's findings, inferences, conclusions, or decisions are not reasonably supported by substantial evidence or are arbitrary and capricious. TEX. GOV'T CODE § 2001.174(2)(E), (F).

30

Because an agency's findings are presumed to be supported by substantial evidence, it is essential that they be "'clear, specific, *non-conclusory*, and supporting of the ultimate statutory findings.'" *Save Our Springs All., Inc. v. TCEQ*, No. 23-0282, 2025 WL 1085176, at *13 (Tex. Apr. 11, 2025) (slip op.) (emphasis added) (quoting TEX. GOV'T CODE § 2001.141(b) and *Tex. Health Facilities Comm'n v. Charter-Med.-Dall., Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)). "Mere recitals of testimony or references to or summations of the evidence are improper. . . . The findings should relate to material basic facts and should relate to the ultimate statutory finding they accompany." *Charter-Med.-Dall.*, 665 S.W.2d at 452.

This is not merely a "technical prerequisite." *Id.* Rather, clear findings of fact are essential for citizens to understand and appeal to the courts and for courts to properly exercise their role in reviewing administrative decisions. *Id.* (citing *Miller v. R.R. Comm'n*, 363 S.W.2d 244, 245–46 (Tex. 1962)).

The TMB found Dr. Guevara liable for "fail[ing] to use proper diligence in one's professional practice," which constitutes "fail[ure] to practice in an acceptable professional manner consistent with public health and welfare." *CR 40 ¶ 9* (citing TEX. OCC. CODE § 164.051(a)(6); 22 TEX. ADMIN. CODE § 190.8(1)(C) (repealed in 2025)).

But the ALJ's findings of fact do not describe—*at all*—how Dr. Guevara purportedly failed to use proper diligence in his professional practice.

The "Analysis" section of the ALJ's proposal for decision (which the TMB did not adopt in its final agency decision) is similarly unhelpful. *See CR 40* (adopting findings of fact and conclusions of law only). Under the heading "Disciplinary Action for Failure to Use Proper Diligence in One's Professional Practice," the ALJ reasoned that "[g]iven the close relationship between [MAB's] departments and considering Dr. Guevara's roles in and ownership of both, the ALJ finds that MAB's radiology department and medical practice can both be reasonably considered part of Dr. Guevara's medical practice." *CR 293–94*. The ALJ also stated:

> Because DSHS found extensive and systemic problems at MAB . . . this likewise establishes a failure by Dr. Guevara to use reasonable diligence in his professional practice. This constitutes a failure to practice in an acceptable manner consistent with the public health and welfare, for which the Board by [*sic*] impose disciplinary sanctions.

*CR 294* (citing TEX. OCC. CODE § 164.051(a)(6); 22 TEX. ADMIN. CODE § 190.8(1)(C) (repealed in 2025)).

In other words, the ALJ apparently concluded Dr. Guevara failed to use diligence in his professional medical practice *solely* because he owns MAB and

32

because MAB was disciplined by DSHS. The TMB adopted this bald conclusion completely uncritically.

Again, nothing in the Medical Practice Act or the Administrative Code authorizes the TMB to automatically impute any deficiencies of a medical office to its physician owner. Accordingly, the TMB's finding that Dr. Guevara was not diligent in the practice of medicine is unsupported by substantial evidence and is therefore arbitrary and capricious.

## IV. The TMB's imposition of penalties is unreasonable, arbitrary, and capricious.

Even where substantial evidence supports an agency's decision, the decision may nevertheless be arbitrary and capricious if the agency failed to consider a factor the legislature directed it to consider, considered an irrelevant factor, *or reached an unreasonable result. Tex. Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 246 (Tex. App.—Austin 2008, no pet.); *see also McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (recognizing courts "do not defer to the agency's conclusory or unsupported suppositions") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The final agency decision in this case restricts Dr. Guevara from owning, operating, acting as an RSO or medical director for, or being in any way

33

associated with "any imaging program including a program that performs mammography, and any facility where imaging studies, including . . . mammography, are performed or interpreted." *CR 40–41 ¶ 1.* The TMB also barred Dr. Guevara from "supervis[ing] or delegat[ing] to any healthcare personnel engaged in the performance of imaging studies." *CR 41 ¶ 3.*

These restrictions are arbitrary, capricious, and unreasonable because they go far beyond the scope of this matter and even the DSHS Case. Both cases exclusively concerned MAB's operational deficiencies in mammography only. *See CR 33–45, CR 120–60.* There has never been any allegation or evidence that any non-mammographic imaging studies performed by MAB were in any way deficient. Restricting Dr. Guevara's ability to even be associated with a radiology department is an arbitrary and capricious restraint on his livelihood that is wholly untethered from the facts of this case.

By sweepingly restricting Dr. Guevara's association with and ownership of MAB's entire radiology department (as opposed to just mammography), the TMB is depriving Dr. Guevara of property rights in his own business without due process of law. Further, by restricting Dr. Guevara from acting as an RSO, the TMB is encroaching upon DSHS's exclusive jurisdiction to regulate RSOs— particularly where DSHS did not impose that penalty in the DSHS Case. *See generally* 25 TEX. ADMIN. CODE ch. 289.

The TMB's imposition of penalties is therefore arbitrary, conclusory, and completely unreasonable, and the Court must set it aside. *See McDonnell Douglas Corp.*, 375 F.3d at 1187; *State Farm Lloyds*, 260 S.W.3d at 246.

## Conclusion and Prayer

The TMB far exceeded the bounds of its legislatively delegated authority by imposing professional discipline on a physician for conduct wholly unconnected with his practice of medicine. The TMB also stripped a business owner of a substantial portion of his livelihood without substantial evidence and in an arbitrary, capricious, and unreasonable manner.

The APA is clear—courts *shall* reverse any agency decision that is an abuse of discretion, is unsupported by substantial evidence, or is arbitrary, capricious, or unreasonable. Because the TMB's final order is all these things, this Court should reverse and vacate it in its entirety.

Dated: June 30, 2025.

<div style="margin-left:50%">

Respectfully submitted,

**DAVIS & SANTOS, PLLC**

By: */s/Hayley Ellison*
Jason Davis
State Bar No. 00793592
E-mail : *jdavis@dslawpc.com*
Hayley Ellison
State Bar No. 24074175
E-mail: *hellison@dslawpc.com*
719 S. Flores Street
San Antonio, Texas 78204
Tel: (210) 853-5882
Fax: (210) 200-8395

***Attorneys for Appellant***

</div>

# Certificate of Compliance

Pursuant to Texas Rule of Appellate Procedure 9.4, I certify that this brief contains 5,045 words.

/s/ *Hayley Ellison*
Hayley Ellison

# Certificate of Service

Pursuant to Texas Rule of Appellate Procedure 9.5, I certify that on June 30, 2025, I served a true and correct copy of this document on all parties and counsel of record via the e-file system:

Kathy Johnson
E-mail: *Kathy.Johnson@oag.texas.gov*
Ted Ross
E-mail: *Ted.Ross@oag.texas.gov*
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711
Tel.: (512) 475-4191

/s/ *Hayley Ellison*
Hayley Ellison

# Tab A

NO. **D-1-GN-23-007371**

| | | |
|---|---|---|
| **JORGE R. GUEVARA, M.D.** | § | **IN THE DISTRICT COURT** |
| | § | |
| **V.** | § | |
| | § | **353rd JUDICIAL DISTRICT** |
| | § | |
| **TEXAS MEDICAL BOARD** | § | **TRAVIS COUNTY, TEXAS** |

## FINAL ORDER ON PLAINTIFF'S ORIGINAL PETITION

On November 13, 2024, in open court, the Court heard oral argument in the above-referenced administrative appeal.

*Appearances*

**ETHAN LAU**, appeared on behalf of Plaintiff Dr. Jorge R. Guevara, and announced ready.

**TEXAS MEDICAL BOARD**, Defendant, appeared by and through counsel, Assistant Attorneys General **TED ROSS** and **KATHY JOHNSON**, and announced ready.

*Record*

The hearing was recorded by substitute Certified Court Reporter, Melissa Voight.

*Jurisdiction*

The Court, after examining the record and hearing the evidence and argument of counsel, finds that all necessary prerequisites of the law have been legally satisfied and that this Court has jurisdiction of this case and of the parties.

*Relief Denied*

After careful review of the administrative record, the Proposal For Decision (signed May 20, 2021), the Texas Medical Board's Final Order (signed July 9, 2021), Plaintiff's Brief on the Merits (filed August 26, 2024), Brief of Defendant Texas Medical Board (filed September 26, 2024), and argument of counsel, the Court **DENIES** all relief requested by **DR. JORGE R.**

Page **1** of **2**

**GUEVARA** in his Original Petition. (filed 10/12/2023). The Court further **FINDS** that substantial evidence supports the findings in the Final Order, and that Plaintiff's arguments based on the legal theories that Texas Medical Board denied him due process and exceeded its authority in disciplining Plaintiff, (see Plaintiff's Brief at pg. 1, ¶ B), are without merit.

ACCORDINGLY, the Board's Final Order is, in all respects, **AFFIRMED**.

IT IS SO ORDERED.

SIGNED in Chambers on December 30, 2024.

_____
MADELEINE CONNOR, JUDGE PRESIDING

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 04/25/2025 11:11:16

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH

Page **2** of **2**

# Tab B

HEARING CONDUCTED BY THE
TEXAS STATE OFFICE OF ADMINISTRATIVE HEARINGS
SOAH DOCKET NO. 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
TEXAS MEDICAL LICENSE NO. J9070

| | |
|---|---|
| TEXAS MEDICAL BOARD,<br>*Petitioner* | BEFORE THE STATE OFFICE |
| v. | OF |
| JORGE R. GUEVARA, M.D.,<br>*Respondent* | ADMINISTRATIVE HEARINGS |

During an open meeting at Austin, Texas, the Texas Medical Board (Board) finds that the above-styled case was assigned to and presided over by Administrative Law Judge (ALJ) Sarah Starnes of the State Office of Administrative Hearings (SOAH). The hearing on the merits was convened on December 12, 2022. The ALJ issued a Proposal for Decision (PFD) on May 3, 2023 that contained Findings of Fact and Conclusions of Law. The PFD was properly served on all parties, and all parties were given an opportunity to file exceptions and replies as part of the record herein.

Board Staff filed Exceptions to the Proposal for Decision on May 17, 2023 to request that FOF No. 11 language be modified to reflect the Respondent's actual testimony, and to request that COL No. 10 language be modified to more directly reflect the basis for imposing aggravating factors. Respondent, Jorge Guevara, M.D., also filed Exceptions to the Proposal for Decision on May 18, 2023 to request that almost all FOF's and COL's be modified. Both parties also filed Responses to the other's Exceptions to the Proposal for Decision. The ALJ issued and Exceptions Letter on June 6, 2023 adopting all of Board Staff's exceptions and none of the Respondent's.

The Board, after review and due consideration of the PFD, adopts the Findings of Fact and Conclusions of Law of the ALJs.

## FINDINGS OF FACT

### Background

1. Jorge R. Guevara, M.D. is a physician and holds Texas Medical License No. J-9070, issued by the Texas Medical Board (Board) on December 8, 1995. He is board-certified in internal medicine and substance abuse/addiction.
2. At all times material to this action, Dr. Guevara was a physician licensed by the Board.

Page 33

3. At all times material to this action, Dr. Guevara was subject to the provisions of the Texas Occupations Code and Texas Administrative Code as these pertain to the Texas Medical Board.

4. Dr. Guevara has previously the subject of disciplinary action by the Board as follows:
   a. On July 28, 2010, Dr. Guevara signed an Agreed Order (the 2010 Order) because the Panel of the Board found he failed to maintain adequate and accurate medical records. Dr. Guevara was required to take eight hours of continuing medical education (CME) in recordkeeping and four hours in HIPAA related issues.

   b. On February 10, 2012, the Board entered a Mediated Agreed Order (the 2012 Order) after filing a [State Office of Administrative Hearings (SOAH)] complaint against Dr. Guevara for failing to timely diagnose a patient's Stage IV cancer. The 2012 Order found that Dr. Guevara failed to document a plan to adequately follow up on abnormal findings in X-ray and laboratory test results, and required him to complete sixteen hours of CME consisting of eight hours in risk management, four hours in diagnostic imaging, and four hours in evaluation and treatment of anemia and other blood disorders.

5. At all times material to this action, Dr. Guevara has been the president and sole owner of Medical Associates of Brownsville, PA (MAB), a medical practice in Brownsville, Texas, that includes a radiology department and Dr. Guevara's family medical practice.

6. MAB was the subject of an enforcement action brought by the Texas Department of State Health Services (DSHS) in SOAH Docket No. 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 (the DSHS proceeding), which arose from an inspection of MAB conducted by a DSHS inspector in January 2019.

7. In the DSHS Proceeding, Administrative Law Judge (ALJ) Andrew Lutostanski wrote a Proposal for Decision (PFD) that was adopted without change in a Final Order signed by Commissioner of Public Health, John W. Hellerstedt, M.D., on July 9, 2021.

8. After weighing the evidence, ALJ Lutostanski made the following Findings of Fact (FOFs) relevant to this proceeding:

   > **DSHS FOF 1:** Medical Associates of Brownsville, PA [MAB] was a licensed mammography facility. MAB performed mammography in Texas for about 20 years.
   > **DSHS FOF 2:** In December 2017, MAB was inspected. MAB had deficiencies in its mammography medical outcomes audit program, its quality assurance, and its quality control tests. MAB had no deficiencies for image quality.
   > **DSHS FOF 3:** A mammography technologist works with the patient, takes an image, and reviews it. Then the interpreting physician reviews the image, determines whether the image is acceptable, and interprets the image to determine whether the patient has breast cancer.
   > **DSHS FOF 4:** Nancy Soto was MAB's mammogram technologist until

Page 2 of 13

November 2018.

**DSHS FOF 5**: In November 2018. Sergio Lugo was hired as MAB's mammogram technologist and began working at MAB.

**DSHSFOF 6**: Dr. Allan Kapilivsky was MAB's lead interpreting physician.

**DSHS FOF 7**: Dr. Jorge R. Guevara owned MAB and was its radiation safety officer.

**DSHS FOF 8**: The Department of State Health Services DSHS] regulates mammography facilities. Inspector Craig Sutton worked for DSHS.

**DSHS FOF 9**: In December 2018, Inspector Craig Sutton spoke to MAB's manager, Kim Barner. Ms. Barner told Inspector Sutton that MAB had hired a new mammogram technologist, and she requested the inspection take place in January 2019. The inspection was scheduled for January 10, 2019.

**DSHS FOF 10**: A few days before the inspection, Inspector Sutton again spoke to Ms. Barner. Based on their conversation, Inspector Sutton suspected that MAB's new mammogram technologist might not be qualified for the position. Inspector Sutton decided to address the matter at the inspection.

**DSHS FOF ll**: On January 10 and 11, 2019, Inspector Sutton inspected MAB.

**DSHS FOF 12**: MAB failed to establish and maintain a mammography medical outcomes audit program. MAB failed to establish a system to collect and review outcome data, and MAB failed to analyze the data as required.

**DSHS FOF 13**: Despite lacking the qualifications to do so, Sergio Lugo worked for MAB as a mammography technologist. Mr. Lugo performed about 67 mammograms for MAB from November 29, 2018, to January 10, 2019.

**DSHS FOF 14**: As the lead interpreting physician, Dr. Kapilivsky was responsible for quality assurance tasks. Dr. Kapilivsky failed to document the mammography technologist's quality control test results for two quarters and failed to determine the mammography technologist's qualifications to perform quality assurance tasks.

**DSHS FOF 15**: MAB's quality control tests were inadequate. The phantom image test was not performed as recommended by the the manufacturer, the signal-to-noise and contrast-to noise tests were not performed every three months as required, and quality control tests were not performed as required by the manufacturer or unacceptable results were obtained.

**DSHS FOF 16**: MAB failed to verify Mr. Lugo's qualifications to work as a mammography technologist.

**DSHS FOF 17**: MAB failed to maintain a quality assurance program. Dr. Kapilivsky failed to maintain the program and ensure requirements were met. In particular, Dr. Kapilivsky failed to review the program on a quarterly basis and inform the technologist of deficiencies, and he failed to closely examine images, identify when images were unacceptable, and address images of deficient quality.

**DSHS FOF 18**: For some clients, MAB failed to send a report no later than 30 days from the date of the mammography examination stating the results

of the mammography examination and any further medical needs indicated. MAB's records were also disorganized and not well maintained.

**DSHS FOF 19:** MAB did not perform an annual sample image review. MAB did not review the mammography technologist's images and the interpreting physician's images and determine if the image quality was acceptable and whether the interpreting physician's assessment was correct.

**DSHS FOF 20:** As MAB's radiation safety officer, Dr. Guevara failed to ensure that facility personnel were adequately trained and complying with regulations. Dr. Guevara failed to ensure that Mr. Lugo was trained and qualified to work as a mammography technologist, and Dr. Guevara failed to ensure that Dr. Kapilivsky was performing the duties of a lead interpreting physician involving quality assurance and control.

**DSHS FOF 21:** On the first day of the inspection on January 10, 2019, Inspector Sutton informed MAB that it must cease performing mammograms until hiring a qualified mammography technologist. MAB agreed to temporarily cease operating. Inspector Sutton gave MAB an emergency cease and desist order. The next day, Dr. Guevara signed the order.

**DSHS FOF 22:** MAB complied with the Department's order to cease operating.

**DSHS FOF 23:** After the inspection, the Department requested a review of images taken from November 7, 2018, to January 9, 2019. For this period, 30 of MAB's cases were randomly selected, except that, because MAB had two mammography technicians during this period, some of each technician's work was chosen. The 30 images selected were taken by MAB over 20 days.

**DSHS FOF 24:** MAB's images were sent to the American College of Radiology for review.

**DSHS FOF 25:** All 30 of MAB's images were of poor quality. 27 of the 30 failed images were taken by Mr. Lugo. Three of the failed images were taken by Ms. Soto. Dr. Kapilivsky failed on all 30 occasions to ensure the quality of the images.

**DSHS FOF 26:** On 30 occasions, the quality of MAB's clinical images failed to meet the standards of its accrediting body.

**DSHS FOF 27:** In many cases, Dr. Kapilivsky provided a final assessment that the patient did not have breast cancer. The reviewer disagreed with Dr. Kapilivsky's assessment in all 30 cases.

**DSHS FOF 28:** On 30 occasions, MAB's images were of such poor quality that they did not reveal whether the patient had breast cancer.

**DSHS FOF 29:** The Department informed MAB of the result of the image review.

**DSHS FOF 30:** The Department did not conduct additional image reviews but required MAB to notify patients who went to MAB within two years preceding the dates of the failed images that their mammography results might be suspect. MAB notified these patients.

**DSHS FOF 33:** MAB committed serious violations involving the quality of mammographic images that presented a hazard or potential hazard to public

health or safety because the images were of insufficient quality to detect breast cancer. The facility also committed less serious violations.

9. ALJ Lutostanski made Conclusions of Law (COLs) that MAB had committed the following violations of the DSHS regulations governing mammography facilities:

**DSHS COL 5**: A mammography facility must perform a mammography medical outcomes audit that complies with specific requirements. 25 Tex. Admin. Code § 289.230(w).

**DSHS COL 6**: MAB failed to perform a medical outcomes audit in compliance with those requirements and specifically violated 25 Texas Administrative Code § 289.230(w) (l) by failing to establish a system to collect and review outcome data and (w) (2)-(3) by failing to analyze the audit data as required.

**DSHS COL 7**: MAB violated 25 Texas Administrative Code § 289.230(r) (2) by having an unqualified person perform mammographic examinations.

**DSHS COL 8**: MAB violated 25 Texas Administrative Code § 289.230(u) (l) (A) by failing to perform required tasks as part of a quality assurance program that is substantially the same as the quality assurance program recommended by the image receptor manufacturer.

**DSHS COL 9**: MAB violated 25 Texas Administrative Code § 289.230(v)(7) by failing to perform quality control tests.

**DSHS COL 10**: MAB violated 25 Texas Administrative Code § 289.230(n) (2) by failing to verify and maintain copies of a mammogram technologist's qualifications.

**DSHS COL 11**: MAB violated 25 Texas Administrative Code § 289.230(u) by failing to establish and maintain a written quality assurance program to ensure the safety, reliability, clarity, and accuracy of mammography service performed at the mammography facility, including corrective actions to be taken if images are of poor quality.

**DSHS COL 12**: MAB violated 25 Texas Administrative Code § 289.230(t) (2) (A) by failing to send reports as soon as possible, but no later than 30 days from the date of the mammography examination, to patients advising them of the results of the mammography examination and any further medical needs indicated.

**DSHS COL 13**: MAB violated 25 Texas Administrative Code § 289.230(z) because thirty of MAB's images failed to comply with the standards for clinical image quality established by that facility's accreditation body.

**DSHS COL 14**: MAB violated 25 Texas Administrative Code § 289.226(n) (2) because its radiation safety officer failed to ensure that facility personnel were adequately trained and complying with administrative rules.

10. The DSHS Final Order adopted ALJ Lutostanski's recommendation that MAB be fined $105,000 for the above-listed violations.

11. MAB has not performed mammograms since the DSHS inspection in January 2019, but has continued to provide other services such as X-ray, ultrasounds, CAT scan, and MRI. a

12. Dr. Guevara's medical practice at MAB and MAB's radiology department are closely connected. Both operate under the same business name (Medical Associates of Brownsville) and out of the same building, and both are owned by the same parent company, which is wholly owned by Dr. Guevara.

13. Dr. Guevara's medical practice at MAB and MAB's radiology department are both part of Dr. Guevara's professional practice.

14. Almost all of MAB's mammography patients (between 90-99% of them, by Dr. Guevara's estimation) were Dr. Guevara's patients; he referred them from his medical practice at MAB to MAB's radiology department.

15. Dr. Kapilivsky has been a board-certified radiologist since 1995. From approximately 2007 to 2020, Dr. Kapilivsky worked part-time as MAB's lead interpreting physician.

16. Dr. Kapilivsky lives in McAllen, Texas, approximately 90 minutes away from Brownsville, where MAB is located. He did almost all of his work for MAB remotely, viewing electronic images from home and submitting his reports electronically.

17. At times, Dr Kapilivsky raised concerns about the quality of some of the mammography images he was asked to interpret for MAB, speaking with Dr. Guevara or with technologists (techs) directly. Dr. Kapilivsky did not have the authority to hire or fire the techs and did not believe it was his responsibility to take corrective actions.

18. Dr. Guevara disavowed having any management or oversight responsibility for MAB's radiology department or its employees. He expected his office manager, Dr. Kapilivsky, and the radiology techs to ensure MAB complied with the regulations governing mammography facilities.

19. Though he was the designated radiation safety officer (RSO) for MAB, Dr. Guevara did not consider it his responsibility to make sure MAB followed radiation safety regulations.

20. Dr. Guevara blamed his office manager, Mr. Lugo, and the DSHS inspector for the fact that Mr. Lugo was allowed to perform mammograms at MAB from November 2018, to January 2019, despite lacking the required credentials or qualifications.

21. Dr. Guevara's failings as MAB's RSO were likely to deceive or defraud the public, because patients received mammograms from unqualified staff, performed in a facility with inadequate quality control and quality assurance, resulting in images of such poor quality that they were useless as a cancer screening tool.

22. Given his roles as owner of MAB, RSO for the radiology department, and his patients' referring physician, Dr. Guevara was uniquely positioned to know of the deficiencies in

MAB's radiology department and to understand he was placing his patients at risk by referring them to MAB for mammograms.

23. Dr. Guevara's violations of law in his capacity as RSO for MAB were connected with his practice of medicine in a manner that was likely to deceive or defraud the public.

24. Dr. Guevara failed to adequately supervise his employees in MAB's radiology department. He hired the office manager and the lead interpreting physician, and then failed to ensure that they and their subordinates were adequately performing their duties.

25. Dr. Guevara should have known that MAB had hired an unqualified radiology tech (Mr. Lugo). That Dr. Guevara delegated MAB's hiring decisions to an office manager does not absolve him of responsibility, as owner and = physician, for the office manager's lapses.

26. Dr. Guevara delegated professional medical responsibility to Mr. Lugo when he allowed Mr. Lugo to perform mammography, a medical service, for the radiology department connected to Dr. Guevara's medical practice.

27. On March 8, 2022, the Board's staff (Staff) issued its Notice of Adjudicative Hearing to Dr. Guevara. The notice of hearing contained a statement of the time, place, and nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and either a short, plain statement of the factual matters asserted or an attachment that incorporated by reference the factual matters asserted in the complaint or petition filed with the state agency.

28. The hearing on the merits was originally scheduled to convene on October 25, 2022, but was continued at the request of Staff.

29. The hearing on the merits was held via Zoom videoconference on December 12, 2022, before SOAH ALJ Sarah Starnes in Austin, Texas. Senior Staff Attorney Georgette Oden represented Staff of the Board, and Dr. Guevara was represented by attorneys John. Rivas and Ethan Lau. The record closed on April 21, 2023, after submission of written closing arguments by the parties.

## CONCLUSIONS OF LAW

1. The Board has jurisdiction over this matter pursuant to the Medical Practice Act (Act), Texas Occupations Code, chapter 164.

2. SOAH has jurisdiction to hold a contested case hearing and to issue findings of fact and conclusions of law, subject to the provisions of § 164.007 of the Act, pursuant to Texas Government Code, chapter 2003.

3. Notice of the Complaint and of the hearing on the merits was provided as required by § 164.005(f) of the Act and Texas Government Code §§ 2001.051-.052.

DISTRICT COURT OF TRAVIS COUNTY TEXAS

Page 2 of 13

4. Staff had the burden to prove the alleged violations and any aggravating factors by a preponderance of the evidence. 1 Tex. Admin. Code § 155.427; 22 Tex. Admin. Code § 190.15(a).

5. The findings in the DSHS Final Order in SOAH Docket No. 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 have preclusive, collateral estoppel effect against Dr. Guevara in this case. *See Barr v. Resolution Tr. Corp. ex rel. Sunbelt Fed. Sav.,* 837 S.W.2d 627, 628 (Tex. 1992); *Eagle Properties) Ltd. v. Scharbauer,* 807 S.W.2d 714, 721 (Tex. 1990).

6. Dr. Guevara is subject to disciplinary action by the Board because he engaged in unprofessional conduct that was likely to deceive or defraud the public by committing acts that (a) violated the regulations governing mammography providers and their RSOs and (b) were connected to Dr. Guevara's practice of medicine. Tex. Occ. Code § § 164.051(a)(l), .052(a)(5), .053(a)(l).

7. Dr. Guevara is subject to disciplinary action because he engaged in unprofessional conduct that was likely to deceive or defraud the public by failing to adequately supervise the activities of employees under his supervision. Tex. Occ. Code § § 164.051(a)(l), .052(a)(5), .053(a)(8).

8. Dr. Guevara is subject to disciplinary action because he engaged in unprofessional conduct that was likely to deceive or defraud the public by delegating professional medical responsibility or acts to a person he knew or had reason to know was not qualified to perform those responsibilities or acts. Tex. Occ. Code § § 164.051(a)(l), .052(a)(5), .053(a)(9).

9. Dr. Guevara is subject to disciplinary action because he failed to use proper diligence in his professional practice, which constitutes a failure to practice in an acceptable manner consistent with the public health and welfare. Tex. Occ.Code § 164.051(a)(6) ; 22 Tex. Admin. Code § 190.8 (1)(C).

10. As aggravating factors in determining sanctions, the Board may consider:
    - the increased potential for harm to the public caused by Dr. Guevara's violations;
    - Dr. Guevara ' s two prior Agreed Orders with the Board; and
    - Dr. Guevara ' s continuing refusal to accept responsibility for the violations that DSHS found were committed by MAB and by Dr. Guevara increases the seriousness of the misconduct.

    22 Tex. Admin. Code § 190.15 (a)(S), (9), (11).

## **ORDER**

The Board hereby adopts the above Findings and Conclusions of Law, the Board ORDERS that Respondent shall be subject to the following terms and conditions:

1. Respondent shall not own, operate, act as radiation safety officer for, act as medical director for or otherwise be associated with any imaging program including a program that

Page 8 of 13

performs mammography, and any facility where imaging studies, including but not limited to mammograms, are performed or interpreted.

2. Respondent shall not perform any imaging services.

3. Respondent shall not supervise or delegate to any healthcare personnel engaged in the performance of imaging studies.

4. Within one year following the date of the entry of this Order, Respondent shall take and pass with a score of 75 or above the Jurisprudence Examination (JP Exam) given by the Board. Respondent is allowed three attempts to successfully pass this examination.

Respondent's failure to take and pass the JP Exam within three attempts within one year following the date of the entry of this Order shall constitute a violation of this Order.

5. Within one year from the date of the entry of this Order, Respondent shall enroll in and successfully complete at least 20 hours of continuing medical education (CME) approved for Category I credits by the American Medical Association or the American Osteopathic Association, divided as follows: 12 hours in the topic of supervision and delegation, and 8 hours in the topic of risk management, each approved in writing in advance by the Executive Director or a designee. To obtain approval for the course, Respondent shall submit in writing to the Compliance Department information on the course, to include at least a reasonably detailed description of the course content and faculty, as well as the course location and dates of instruction. Respondent shall submit documentation of attendance and successful completion of this requirement to the Compliance Department on or before the expiration of the time limit set forth for completion of the course. The CME requirements set forth in this paragraph shall be in addition to all other CME required for licensure maintenance.

6. Within 30 days from the date of the entry of this order, Respondent shall contact the Center for Personalized Education for Professionals (CPEP) program to enroll in the PROBE Ethics and Boundaries Course and the six-month follow-up program, Personalized Implementation Program (PROBE Plus). Upon Respondent's enrollment into the CPEP PROBE Ethics and Boundaries Course and the six-month follow-up PROBE Plus program, Respondent shall execute all necessary releases and authorization to CPEP representatives to allow for the provide a complete copy of the final assessment report to the Compliance Division within 15 days of its completion.

Respondent shall successfully complete PROBE Ethics and Boundaries Course within one year of the date of the entry of this Order. Respondent shall successfully complete the PROBE

Plus within seven months of the date of completion of the PROBE Ethics and Boundaries Course. Respondent shall submit documentation of attendance and successful completion of both requirements to the Compliance Division of the Board on or before the expiration of the time limit set forth for completion of the programs.

7. Respondent shall pay an administrative penalty in the amount of $10,000 within 90 days of the date of the entry of this Order. The administrative penalty shall be paid in a single payment by cashier's check or money order payable to the Texas Medical Board and shall be submitted to the Board for routing so as to be remitted to the Comptroller of Texas for deposit in the general revenue fund. Respondent's failure to pay the administrative penalty as ordered shall constitute grounds for further disciplinary action by the Board, and may result in a referral by the Executive Director of the Board for collection by the Office of the Attorney General.

8. At all times while Respondent is under the terms of this Order, Respondent shall give a copy of this Order to all hospitals, nursing homes, treatment facilities, and other health care entities in Texas where Respondent has privileges, has pending an application for privileges, applies for privileges, or otherwise practices. Within 30 days of being first contacted by the Compliance Division of the Board following entry of this Order, Respondent shall provide to the Compliance Division of the Board documentation, including proof of delivery, that the Order was delivered to all such facilities.

9. Pursuant to Board Rule 189.15, the time period of this Order shall be extended for any period of time that: (a) Respondent subsequently practices exclusively outside the State of Texas; (b) this Order is stayed or enjoined by Court Order; or (c) for any period of time longer than 60 consecutive days that Respondent does not actively practice medicine and such cessation in practice is NOT due to a suspension of Respondent's license. Respondent shall immediately notify the Board in writing in the event that Respondent leaves Texas to practice elsewhere or ceases active practice for more than 60 consecutive days. Upon Respondent's return to active practice or return to Texas, Respondent shall notify the Board in writing. Upon return to Texas or active practice, Respondent shall be required to comply with the terms of this Order for the period of time remaining on the Order. Respondent shall pay all fees for reinstatement or renewal of a license covering the period of extension or tolling. Tolling shall be in accordance with Board Rule 189.15.

10. Respondent shall comply with all the provisions of the Act and other statutes regulating the Respondent's practice.

11. Respondent shall fully cooperate with the Board and the Board staff, including Board attorneys, investigators, compliance officers. consultants, and other employees or agents of the Board in any way involved in investigation. review, or monitoring associated with Respondent's compliance with this Order. Failure to fully cooperate shall constitute a violation of this order and a basis for disciplinary action against Respondent pursuant to the Act.

12. Respondent shall inform the Board in writing of any change of Respondent's practice or mailing address within 10 days of the address change. This information shall be submitted to the Registrations Department and the Compliance Department of the Board. Failure to provide such information in a timely manner shall constitute a basis for disciplinary action by the Board against Respondent pursuant to the Act. Respondent agrees that 10 days' notice of a Probationer Show Compliance Proceeding to address any allegation of non-compliance with this Order is adequate and reasonable notice prior to the initiation of formal disciplinary action. Respondent agrees that any proceeding related to this Order may be held in person, by teleconference, or by videoconference at the discretion of the Board.

13. Any violation of the terms, conditions, or requirements of this Order by Respondent shall constitute unprofessional conduct likely to deceive or defraud the public, or to injure the public, and shall constitute a basis for disciplinary action by the Board against Respondent pursuant to the Act.

14. This Order constitutes a restriction on Respondent's license and Respondent shall not be permitted to supervise or delegate prescriptive authority to a physician assistant or advanced practice nurse or supervise surgical assistants.

15. The above referenced conditions shall continue in full force and effect without opportunity for amendment, except for clear error in drafting, for one year following the date of the entry of this Order, with the exception of Ordering Provision Nos. 1, 2, 3, and 13 which are permanent restrictions on Respondent's license and not subject to modification or termination, except for clear error in drafting. If, after the passage of the one-year period, Respondent wishes to seek amendment or termination of these conditions eligible for modification or termination, Respondent may petition the Board in writing. The Board may inquire into the request and may, in its sole discretion, grant or deny the petition without further appeal or review. Petitions for modifying or terminating may be filed only once a year.

[SIGNATURE ON FOLLOWING PAGE]



SIGNED AND ENTERED by the presiding officer of the Texas Medical Board on this 18th day of August 2023.



_____

Sherif Z. Zaafran, M.D., President
Texas Medical Board

# Tab C

573 S.W.3d 796
Supreme Court of Texas.

Ruben ALEMAN, M.D., Petitioner,

v.

TEXAS MEDICAL BOARD, Respondent

No. 17-0385
|
Opinion delivered: May 24, 2019

**Synopsis**
**Background:** Physician brought action against county, seeking judicial review of Medical Board order which assessed administrative penalty on physician for failing to electronically certify death certificate. The 53rd Judicial District Court, Travis County, Stephen Yelenosky, J., 2016 WL 8445866, affirmed. Physician appealed. The Austin Court of Appeals, 565 S.W.3d 26, affirmed. Physician filed petition for review.

**Holdings:** The Supreme Court, Lehrmann, J., held that:

complaint was statutorily compliant;

Medical Practice Act did not authorize disciplinary action for physician's conduct; and

State Office of Administrative Hearings (SOAH) lacked authority to award attorney fees to physician.

Affirmed in part, reversed in part, and rendered.

Blacklock, J., filed concurring opinion in which Brown, J., joined.

Boyd, J., filed dissenting opinion.

**Procedural Posture(s):** Petition for Discretionary Review; On Appeal; Review of Administrative Decision.

**\*797** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Attorneys and Law Firms**

Ronald G. Hole, Hole & Alvarez, L.L.P., McAllen, TX, for Petitioner.

Ted A. Ross, Brantley David Starr, Jeffrey C. Mateer, W. Kenneth Paxton Jr., Office of the Texas Attorney General, James Edward Davis, The University of Texas at Austin, Nichole Beth Bunker-Henderson, Assistant Attorney General, Administrative Law Division, Austin, TX, for Respondent.

Donald P. Wilcox, Kelly M. Walla, Laura Thetford, Texas Medical Association, Austin TX, for Amicus Curiae Texas Medical Association.

**Opinion**

Justice Lehrmann delivered the opinion of the Court, in which Chief Justice Hecht, Justice Green, Justice Guzman, and Justice Devine joined, and in which Justice Busby joined except as to footnote 9.

In this administrative appeal, we review the Texas Medical Board's order imposing disciplinary sanctions under the Medical Practice Act against a physician for violating a state law that requires medical certifications for death certificates to be completed electronically. On the physician's petition for judicial review, the trial court affirmed the Board's order, and the court of appeals likewise affirmed. The physician argues that the Board lacked jurisdiction over the proceedings, that the Medical Practice Act does not authorize disciplinary action for the conduct at issue, that compliance with the electronic certification requirement was impossible, that the Board's sanction was so severe as to be an abuse of discretion, and that the physician is entitled to recover attorney's fees. We agree with the physician that disciplinary action was not authorized and thus reverse the court of appeals' judgment in part.

### I. Background

#### A. Death Certificates: Statutory Framework

The Texas Health and Safety Code places the responsibility of filing a death **\*798** certificate on the "person in charge of interment or in charge of removal of a body from a registration district for disposition." TEX. HEALTH & SAFETY CODE § 193.002. With certain inapplicable exceptions, that person

must "obtain the required medical certification from the decedent's attending physician ... if the death occurred under the care of the [physician] in connection with the treatment of the condition or disease process that contributed to the death." *Id.* § 193.005(a). [1] Generally, the Act requires that the medical certification be completed no later than five days after the physician receives the death certificate, *id.* § 193.005(b), [2] and that the certificate be filed with the appropriate local registrar no later than ten days after the death occurs, *id.* § 193.003(a). [3]

In 2007, the Legislature amended chapter 193, adding a provision that requires the person completing the medical certification to "submit the information and attest to its validity using an electronic process approved by the state registrar." Act of May 17, 2007, 80th Leg., R.S., ch. 302, § 2, 2007 Tex. Gen. Laws 577, 577 (codified at TEX. HEALTH & SAFETY CODE § 193.005(h)). During the time period at issue in this case, the approved electronic process for preparing and recording death certificates was the Texas Electronic Death Registration system (known as TEDR), administered by the Texas Department of State Health Services' Vital Statistics Unit. [4]

To use the TEDR system, a physician would submit an application to the Department and receive a password from the registrar. When the person required to file a death certificate (often a funeral director) prepared his portion of the certificate electronically and entered the medical certifier's information, the system automatically notified the certifier via email that certification was necessary. The certifying physician would then log into the system to complete the certification. If the certifier was not registered to use the system, the certificate could be "dropped to paper" by the funeral director, meaning it was removed from the system, and sent to the physician for completion on paper. In either event, the completed certificate was filed with the local registrar.

### B. Factual and Procedural Background

J.S., a patient of Dr. Ruben Aleman's, died on July 16, 2011. The funeral director **\*799** generated and signed J.S.'s death certificate electronically. However, Dr. Aleman was not registered with the TEDR system, so the certificate was dropped to paper and sent to him for manual certification. Dr. Aleman received and hand-certified the paper certificate on July 29. The certificate became "official" on August 8, when it was certified by the local registrar. On August 16, Dr. Aleman submitted an application to register with the TEDR system, and his application was approved and took effect three days later. After registering, Dr. Aleman attempted to certify J.S.'s death certificate electronically. However, the system would not allow him to do so once the certificate became official.

Almost two years later, on May 3, 2013, the Texas Medical Board filed a complaint with the State Office of Administrative Hearings (SOAH) seeking disciplinary action against Dr. Aleman. [5] The complaint, signed and sworn to by a Board staff attorney, alleged that "[r]ather than certifying the patient's death certificate through TEDR as required, [Dr. Aleman] required the mortuary to provide him with a paper death certificate," which he "ultimately signed." The complaint alleged that, in doing so, Dr. Aleman violated Health and Safety Code sections 193.002(4) (requiring death certificates to be filed electronically) and 193.005(h) (requiring death certificates to be medically certified electronically). The complaint further alleged that this conduct violated the Medical Practice Act, which authorizes disciplinary action against a licensed physician for "commit[ting] unprofessional or dishonorable conduct that is likely to deceive or defraud the public," including "an act that violates any state or federal law if the act is connected with the physician's practice of medicine."TEX. OCC. CODE §§ 164.052(a)(5), .053(a)(1). Finally, the complaint alleged the case involved aggravating factors—increased potential for harm to the public and an intentional, premeditated, knowing, or grossly negligent act—that should be taken into consideration in determining sanctions.

Dr. Aleman filed a motion to dismiss and plea to the jurisdiction, arguing that the Board lacked subject matter jurisdiction because the complaint did not comply with the Medical Practice Act's requirements. *See id.* § 164.005. The administrative law judge (ALJ) denied the motion. The ALJ also denied both parties' motions for summary disposition as well as Dr. Aleman's motion for sanctions. After a hearing, the ALJ issued a Proposal for Decision containing findings of fact and conclusions of law. The ALJ found that Dr. Aleman did not violate Health and Safety Code section 193.002(4), which applies only to persons required to *file* death certificates. However, the ALJ concluded that Dr. Aleman did violate section 193.005(h) by failing to complete the medical certification electronically and that his noncompliance "did not result from circumstances beyond his control." In turn, the ALJ found that, because the violation

was related to Dr. Aleman's practice of medicine, he "by definition" violated the Medical Practice Act. The ALJ further found that no aggravating factors were present in the case. Finally, the ALJ concluded that Dr. Aleman was not entitled to, nor was SOAH authorized to award, attorney's fees.

The Board adopted the ALJ's findings and imposed sanctions. Specifically, the Board ordered Dr. Aleman to: take and **\*800** pass the Board's Jurisprudence Examination within one year (in no more than three attempts); pay a $ 3,000 administrative penalty; complete sixteen hours of continuing medical education within one year, including eight hours of ethics and eight hours of risk management; and give a copy of the Board's order to "all hospitals, nursing homes, treatment facilities, and other health care entities" where Dr. Aleman has privileges or otherwise practices.

On Dr. Aleman's petition for judicial review of the Board's order, the trial court affirmed the order in all relevant respects, and the court of appeals affirmed the trial court's judgment. 565 S.W.3d 26 (Tex. App.—Austin 2017). The court of appeals held in pertinent part: (1) the Board's complaint complied with all statutory requirements, *id.* at 31; (2) substantial evidence supported the Board's conclusion that Dr. Aleman violated the Medical Practice Act, *id.* at 35; (3) no legal impossibility excused Dr. Aleman's failure to comply because "the impediment to Aleman's submitting the medical certification electronically was of his own making —his failure to register with the TEDR until August 2011," *id.*; (4) the discipline imposed by the Board was neither in excess of its statutory authority nor arbitrary or capricious, *id.* at 36; and (5) the Board did not abuse its discretion in declining to award Dr. Aleman attorney's fees as sanctions for frivolous pleadings, *id.* at 37. We granted Dr. Aleman's petition for review.

## II. Discussion

### A. Sufficiency of Complaint

Texas Occupations Code section 164.005 prescribes the procedure for instituting formal administrative proceedings against a physician. Dr. Aleman asserts that the formal complaint against him did not comply with the section's requirements, depriving the Board of jurisdiction over this proceeding. The Board responds that the complaint was statutorily compliant and, alternatively, that any defects are not jurisdictional. *SeeCity of DeSoto v. White*, 288 S.W.3d

389, 394 (Tex. 2009) (explaining that we presume statutory requirements are not jurisdictional absent clear legislative intent to the contrary). We hold that the complaint met the statutory requirements and thus need not decide whether those requirements are jurisdictional.

Section 164.005 provides in pertinent part:

(a) In this section, "formal complaint" means a written statement made by a credible person under oath that is filed and presented by a board representative charging a person with having committed an act that, if proven, could affect the legal rights or privileges of a license holder or other person under the board's jurisdiction.

(b) Unless otherwise specified, a proceeding under this subtitle or other applicable law and a charge against a license holder may be instituted by an authorized representative of the board.

(c) A charge must be in the form of a written affidavit that:

(1) is filed with the board's records custodian or assistant records custodian; and

(2) details the nature of the charge as required by this subtitle or other applicable law.

....

(f) A formal complaint must allege with reasonable certainty each specific act relied on by the board to constitute a violation of a specific statute or rule. The formal complaint must be specific enough to:

**\*801** (1) enable a person of common understanding to know what is meant by the formal complaint; and

(2) give the person who is the subject of the formal complaint notice of each particular act alleged to be a violation of a specific statute or rule.

TEX. OCC. CODE § 164.005(a)–(c), (f). Dr. Aleman does not contend that the complaint provided insufficient detail or notice with respect to the particular acts underlying the alleged violations. Rather, he insists that the complaint was not "in the form of a written affidavit" or "made by a credible person under oath" because the Board staff attorney who signed the complaint lacked personal knowledge of the events in question.

As the court of appeals noted, the Texas Government Code defines "affidavit" as "a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer under his seal of office." TEX. GOV'T CODE § 312.011(1). The complaint at issue meets this definition: it is in writing, states facts, is signed by the party stating them, and is sworn and notarized. We apply this definition in construing civil statutes "unless a different meaning is apparent from the context of the statute in which the word appears." *Id.* §§ 312.001, .011. But no such different meaning—i.e., one adding a requirement that the complaint be signed by a person with personal knowledge—is apparent from the context of section 164.005.

To the contrary, section 164.005(b) provides that, "[u]nless otherwise specified, a proceeding under this subtitle or other applicable law and a charge against a license holder may be instituted by an authorized representative of the board." TEX. OCC. CODE § 164.005(b). This provision would make little sense if personal knowledge were required because board representatives typically will not have such knowledge of the facts underlying an alleged Medical Practice Act violation. Further, the statute contains no indication that a formal complaint is intended to have evidentiary value in the proceedings. By contrast, as the court of appeals recognized, affidavits must affirmatively be "made on personal knowledge" to constitute competent evidence in the summary judgment context. TEX. R. CIV. P. 166a(f). Section 164.005 contains no such express requirement, and we decline to imply one. Accordingly, we hold that the complaint against Dr. Aleman complied with the Medical Practice Act.

### B. Authorization for Disciplinary Action Under the Medical Practice Act

Dr. Aleman next argues that the Board erred in taking disciplinary action against him for failing to complete the medical certification for J.S.'s death certificate electronically. Under the Administrative Procedure Act, the Board's order may be reversed if its findings and conclusions are "not reasonably supported by substantial evidence" or are "arbitrary or capricious or characterized by abuse of discretion." TEX. GOV'T CODE § 2001.174(2)(E), (F). The Board's factual findings are reviewed under a substantial evidence standard, meaning they will be upheld if "more than a mere scintilla" of evidence supports them. *City of Dallas v.*

*Stewart*, 361 S.W.3d 562, 566 (Tex. 2012) (internal quotation marks omitted). However, the issue here is not whether Dr. Aleman did or did not certify electronically—it is undisputed that he did not. Rather, the parties dispute whether the Medical Practice Act authorized disciplinary action for that conduct, presenting an issue of statutory interpretation.

 **\*802**  Statutory interpretation involves questions of law that we consider de novo, even when reviewing agency decisions. *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017). We generally "rely on the plain meaning of a statute's words" to discern legislative intent. *Id.* In evaluating that language, we construe the words and phrases chosen by the Legislature in context rather than in isolation. *Id.* at 326. That is, "our objective is not to take definitions and mechanically tack them together," but to "consider the context and framework of the entire statute" and construe it as a whole. *Id.*

Under the Medical Practice Act, the Board has "the power to regulate the practice of medicine." [6] TEX. OCC. CODE § 152.001(a). As part of its authority to enforce the Act, the Board may take disciplinary action against physicians who engage in certain statutorily prohibited practices. *See id.* § 164.051(a). Among these prohibited practices, enumerated in section 164.052, is the commission of "unprofessional or dishonorable conduct that is likely to deceive or defraud the public, as provided by Section 164.053, or injure the public." *Id.* § 164.052(a)(5). In turn, section 164.053 provides a list of acts that, "[f]or purposes of Section 164.052(a)(5), [constitute] unprofessional or dishonorable conduct likely to deceive or defraud the public." *Id.* § 164.053(a). This list includes "an act that violates any state or federal law if the act is connected with the physician's practice of medicine." *Id.* § 164.053(a)(1).

The Board argues that a physician's certifying a death certificate using pen and paper rather than electronically is a violation of state law—specifically, Health and Safety Code section 193.005(h)—and is connected with the physician's practice of medicine. Thus, the Board concludes, such conduct is subject to disciplinary action. Dr. Aleman responds that, even if he technically violated the electronic certification requirement, section 164.053(a)(1) does not encompass this type of conduct, which does not "actually" qualify as unprofessional or dishonorable conduct that could "actually" deceive or defraud the public. For the reasons discussed below, we hold that the Medical Practice Act did not authorize the Board to take disciplinary action against Dr. Aleman.

The Board is correct that, in light of the Health and Safety Code's electronic certification requirement, Dr. Aleman necessarily violated state law by certifying J.S.'s death certificate manually, regardless of his knowledge of the law's existence. But such conduct was subject to disciplinary action under the Act only if "connected with" the practice of medicine. The question thus arises: what kind of connection is required between the conduct at issue and the practice of medicine?

Typically, when applying statutes requiring a connection between two things, our analysis hinges on how direct that connection must be. *See* *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900 (Tex. 2017) (analyzing whether communications were made "in connection with" a matter of public concern under the Texas Citizens Participation Act, and rejecting the court of appeals' determination that more than a "tangential relationship" is required to trigger the Act); *Collingsworth Gen. Hosp. v. Hunnicutt*, 988 S.W.2d 706, 709 (Tex. 1998) (examining whether a hospital employee who was fired for committing **\*803** an assault while off duty had nevertheless been terminated for misconduct "connected with" her work, rendering her ineligible for unemployment benefits). However, in this case, the Medical Practice Act further delimits the scope of the required connection by grouping the conduct described in section 164.053(a)(1) with a list of behavior that is sanctionable as "unprofessional or dishonorable conduct that is likely to deceive or defraud the public." TEX. OCC. CODE §§ 164.052(a)(5), .053(a).

By classifying the prohibited conduct in this way,[7] the Legislature demonstrated its intent to authorize discipline for certain acts that fall within that category. Examining the list of qualifying conduct in its entirety furthers this conclusion:

(a) For purposes of Section 164.052(a)(5), unprofessional or dishonorable conduct likely to deceive or defraud the public includes conduct in which a physician:

(1) commits an act that violates any state or federal law if the act is connected with the physician's practice of medicine;

(2) fails to keep complete and accurate records of purchases and disposals of:

(A) drugs listed in Chapter 481, Health and Safety Code [controlled substances]; or

(B) controlled substances scheduled in the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. Section 801 et seq.);

(3) writes prescriptions for or dispenses to a person who:

(A) is known to be an abuser of narcotic drugs, controlled substances, or dangerous drugs; or

(B) the physician should have known was an abuser of narcotic drugs, controlled substances, or dangerous drugs;

(4) writes false or fictitious prescriptions for:

(A) dangerous drugs as defined by Chapter 483, Health and Safety Code [i.e., drugs that are unsafe for self-medication but are not included on the list of controlled substances]; or

(B) controlled substances scheduled in Chapter 481, Health and Safety Code, or the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. Section 801 et seq.);

(5) prescribes or administers a drug or treatment that is nontherapeutic in nature or nontherapeutic in the manner the drug or treatment is administered or prescribed;

(6) prescribes, administers, or dispenses in a manner inconsistent with public health and welfare:

(A) dangerous drugs as defined by Chapter 483, Health and Safety Code; or

(B) controlled substances scheduled in Chapter 481, Health and Safety Code, or the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. Section 801 et seq.);

(7) violates Section 311.0025, Health and Safety Code [which prohibits billing for a treatment that the provider **\*804** knows was not provided or was improper, unreasonable, or medically or clinically unnecessary];

(8) fails to supervise adequately the activities of those acting under the supervision of the physician; or

(9) delegates professional medical responsibility or acts to a person if the delegating physician knows or has reason to know that the person is not qualified

by training, experience, or licensure to perform the responsibility or acts.

*Id.* § 164.053(a).

It is easy to see how the specific conduct described in subsections (a)(2) through (a)(9)—keeping inadequate records of controlled substances, prescribing drugs to those known to be drug abusers, writing false or fictitious prescriptions for certain drugs, prescribing or administering controlled substances and dangerous drugs in a manner inconsistent with public health and welfare, billing for unperformed or medically unnecessary treatments, failing to adequately supervise, and delegating medical responsibilities to unqualified persons—falls under the umbrella of "unprofessional or dishonorable conduct likely to deceive or defraud the public."[8] The conduct referenced in subsection (a)(1) is less precise, but it is nevertheless intended to fall within the same classification; otherwise, categorizing the conduct at all serves no purpose.

We therefore hold that an act that violates state or federal law is subject to disciplinary action by the Board under the Medical Practice Act only if the act is connected with the practice of medicine in a manner that makes it likely to deceive or defraud the public. In turn, we reject the Board's contention that a sufficient connection exists solely by virtue of the fact that Dr. Aleman certified the death certificate in his capacity as J.S.'s physician. *See* TEX. HEALTH & SAFETY CODE § 193.005(a) (explaining when the medical certification should be obtained from the decedent's attending physician). Construing the scope of the required connection as broadly as the Board suggests contravenes fundamental interpretation principles by favoring microscopic examination of isolated words over consideration of the statute as a whole.[9] It also requires the phrase "likely to deceive or defraud the public" to be effectively read out of the statute entirely, violating another basic tenet of statutory construction. Contrary to the Board's assertion, there is no indication that the Legislature intended to authorize disciplinary **\*805** action under sections 164.052(a)(5) and 164.053 for conduct that is not in fact "likely to deceive or defraud the public." That is, in identifying qualifying behavior, the Legislature did not alter the meaning of the phrase "unprofessional or dishonorable conduct likely to deceive or defraud the public" to include conduct that is not likely to do either.

Indeed, by providing a finite list of acts in section 164.053 that constitute "unprofessional or dishonorable conduct likely to deceive or defraud the public" for purposes of section 164.052(a)(5), the Legislature chose to allow sanctions for some acts that fall within this overarching description but not others. Section 164.053 thus *narrows* the category's scope. But under the Board's reading, subsection (a)(1) simultaneously broadens that scope by incorporating conduct that goes beyond the category's unambiguous parameters. This reading is both internally inconsistent and, again, ignores the Legislature's choice to categorize the conduct in the first instance.

Applying sections 164.052 and 164.053 to the facts at hand, Dr. Aleman's conduct—medically certifying a death certificate using pen and paper rather than the approved electronic system—clearly does not qualify as an act that is connected with the practice of medicine in a manner likely to deceive or defraud the public. Regardless of the method used to complete the medical certification process, the information required is the same, the statutory deadlines are the same, and the certificate's destination—filing with the local registrar—is the same.[10] *See id.* § 193.003. The effect on the public is likewise the same. By contrast, certainly a physician's failure to provide *accurate* information on a death certificate could be classified as connected with the practice of medicine in a manner "likely to deceive or defraud the public," as it would amount to the inclusion of false information in a legally significant public document.

The Board insists that the electronic certification requirement serves an important public purpose by promoting the prompt issuance of death certificates, thereby reducing delays in various postmortem legal proceedings. That may very well be, but if anything it proves the point. Requiring electronic certification may address inefficiencies in the process, but it in no way addresses fraud or deception.[11] And we fail to see how disciplining a physician for failing to comply with that requirement comports with the express policy behind the Act: "to protect the public interest" by "regulat[ing] the granting of [the] privilege [of practicing medicine] and its subsequent use and control." TEX. OCC. CODE § 151.003(1); *see also Sanchez v. Tex. State Bd. of Med. Exam'rs*, 229 S.W.3d 498, 514 (Tex. App.—Austin 2007, no pet.) (noting that "section 164.052 reflects a broader intent to prevent unqualified or otherwise unfit individuals from practicing medicine").

Further, potential fact patterns readily come to mind that only heighten the concerns associated with the Board's overly broad interpretation. For example, suppose **\*806** a physician were cited for speeding while on the way to the hospital to deliver a baby. The physician has likely violated a state law, *see* TEX. TRANSP. CODE §§ 545.351–.352, and under the Board's interpretation the physician's "act" is at least arguably "connected with" his practice of medicine. Again, however, disciplining such conduct is not consistent with either the Act's language—properly construed as a whole—or its purpose. Rather, the statute reflects legislative intent not to allow such conduct, which is in no way connected with the practice of medicine in a manner that makes the act likely to deceive or defraud the public, to be the proper subject of a disciplinary proceeding. [12]

Accordingly, we hold that a physician's act of completing the medical certification for a death certificate manually rather than by using the approved electronic process does not constitute a "prohibited practice" under section 164.052 of the Medical Practice Act, and section 164.051 in turn does not authorize the Board to take disciplinary action against a person for such conduct. Because the Board relied on an erroneous interpretation of the Medical Practice Act to discipline Dr. Aleman, it necessarily abused its discretion in doing so. We therefore reverse the court of appeals' judgment to the extent it upholds the portions of the Board's order (1) concluding that Dr. Aleman violated the Medical Practice Act and (2) imposing sanctions against him. [13]

### C. Attorney's Fees

Finally, Dr. Aleman argues that the ALJ abused its discretion in failing to award him attorney's fees as sanctions under Texas Civil Practice and Remedies Code chapter 10 and Texas Rule of Civil Procedure 13. Dr. Aleman contends that some of the allegations against him in the formal complaint—specifically, that he violated Health and Safety Code section 193.002(4) and that aggravating factors warranted more severe discipline—were groundless and brought in bad faith, justifying an award of attorney's fees as sanctions. The Board concluded that SOAH was not authorized to award attorney's fees in this proceeding, and we agree.

As a state agency, SOAH has those powers the Legislature expressly confers, along with "whatever powers are reasonably necessary to fulfill its express functions or duties." *Pub. Util. Comm'n of Tex. v. City Pub. Serv.*

*Bd. of San Antonio*, 53 S.W.3d 310, 316 (Tex. 2001). Section 2003.0421(a) of the Administrative Procedure Act generally authorizes an ALJ employed by SOAH to "impose appropriate sanctions as provided by Subsection (b) against a party or its representative" for filing a pleading that is groundless and brought in bad faith or for an improper purpose. **\*807** TEX. GOV'T CODE § 2003.0421(a)(1). Subsection (b) then provides:

> (b) A sanction imposed under Subsection (a) may include, as appropriate and justified, issuance of an order:
>
> (1) disallowing further discovery of any kind or of a particular kind by the offending party;
>
> (2) charging all or any part of the expenses of discovery against the offending party or its representatives;
>
> (3) holding that designated facts be considered admitted for purposes of the proceeding;
>
> (4) refusing to allow the offending party to support or oppose a designated claim or defense or prohibiting the party from introducing designated matters in evidence;
>
> (5) disallowing in whole or in part requests for relief by the offending party and excluding evidence in support of those requests; and
>
> (6) striking pleadings or testimony, or both, in whole or in part.

*Id.* § 2003.0421(b). The authorized sanctions do not include issuance of an order awarding attorney's fees.

By contrast, a similar provision of the Administrative Procedure Act authorizing SOAH to impose sanctions in contested cases involving the Public Utility Commission expressly includes as a permissible sanction "an order ... requiring the offending party or its representative to pay ... the reasonable expenses, including attorney's fees, incurred by other parties because of the sanctionable behavior." *Id.* § 2003.049(j)(7). This provision demonstrates that the Legislature has chosen to grant SOAH authority to award attorney's fees in certain circumstances, but not in the context of a disciplinary proceeding against a licensed physician.

Dr. Aleman thus relies on Civil Practice and Remedies Code chapter 10 and Texas Rule of Civil Procedure 13, which "allow a trial court to sanction an attorney or a party for filing motions or pleadings that lack a reasonable

basis in fact or law." *Low v. Henry,* 221 S.W.3d 609, 614 (Tex. 2007). Sanctions imposed under these provisions may include attorney's fees. TEX. CIV. PRAC. & REM. CODE § 10.004(c)(3); TEX. R. CIV. P. 13, 215.2(b)(8). But as the Attorney General of Texas has opined, chapter 10 and rule 13 apply to courts, not administrative agencies. Tex. Att'y Gen. Op. No. JC-0495 (2002) (citing *State v. Flag-Redfern Oil Co.,* 852 S.W.2d 480, 486 n.7 (Tex. 1993) (explaining that an "administrative agency is not a 'court' and its contested case proceedings are not lawsuits")). And Dr. Aleman references no statutory authority directing these provisions to be applied to SOAH in this type of proceeding. Accordingly, the Board correctly held that Dr. Aleman is not entitled to recover attorney's fees.

### III. Conclusion

We hold that (1) the Board had jurisdiction over this proceeding, (2) the Board abused its discretion in finding that Dr. Aleman violated the Medical Practice Act, and (3) Dr. Aleman is not entitled to attorney's fees. Accordingly, we affirm the court of appeals' judgment in part, reverse it in part, and render judgment vacating the sanctions imposed against Dr. Aleman.

Justice Blacklock filed a concurring opinion, in which Justice Brown joined.

Justice Boyd filed a dissenting opinion.

Justice Blacklock, joined by Justice Brown, concurring.

I agree with the Court that a physician who signs a death certificate with a pen does not "commit[ ] unprofessional or dishonorable **\*808** conduct that is likely to deceive or defraud the public." TEX. OCC. CODE § 164.052(a)(5). I write separately to explain my reasons for reaching that conclusion, which differ from the Court's.

Section 164.051(a)(1) of the Occupations Code authorizes the Medical Board to discipline a person who "commits an act prohibited under Section 164.052." Section 164.052(a)(5), in turn, prohibits "commit[ting] unprofessional or dishonorable conduct that is likely to deceive or defraud the public, as provided by Section 164.053." Finally, section 164.053(a)(1) provides: "For purposes of Section 164.052(a)(5), unprofessional or dishonorable conduct likely to deceive or defraud the public includes conduct in which a physician:

(1) commits an act that violates any state or federal law if the act is connected with the physician's practice of medicine."

In the Medical Board's view, any violation of any state or federal law—no matter how mundane or innocuous—has been designated by the legislature as "unprofessional or dishonorable conduct likely to deceive or defraud the public." TEX. OCC. CODE § 164.053(a). In the Court's view, the Board's reading errs by "favoring microscopic examination of isolated words over consideration of the statute as a whole." *Ante* at 804. The dissent correctly points out that there is nothing wrong with "microscopic examination of isolated words" when those words are a legislatively supplied definition of a term. In the dissent's view, the Court's reasoning boils down to the assertion that "the statute simply cannot mean what it expressly says." *Infra* at 814. Yet our job is to apply statutes based on what they expressly say, not what we think they should say. *BankDirect Capital Fin., LLC v. Plasma Fab, LLC,* 519 S.W.3d 76, 78 (Tex. 2017) ("[T]he foremost task of legal interpretation [is] divining what the law *is*, not what the interpreter *wishes* it to be.").

At the risk of engaging in "microscopic examination of isolated words," in my view a careful reading of section 164.053(a)(1) reveals that the Board has oversimplified the statute in a way that eliminates important words of limitation. Contrary to the Board's position, section 164.053(a)(1) is not triggered any time a physician "violates any state or federal law." It is only triggered when a physician "*commits an act that* violates any state or federal law." TEX. OCC. CODE § 164.053(a)(1) (emphasis added). Under the Board's approach, the statute would operate exactly the same way whether or not it contained the words "commits an act that." But we should disfavor any reading that renders these words superfluous. *Pedernal Energy, LLC v. Bruington Eng'g, Ltd.,* 536 S.W.3d 487, 491 (Tex. 2017); *TGS-NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex. 2011) ("[E]ach word [is] chosen for a purpose ...."). In this case, giving these words operative meaning poses no challenge. Their meaning is plain. By placing the words "commits an act that" in front of "violates any state or federal law," the legislature invoked the familiar distinction between acts and omissions. *Compare* TEX. PENAL CODE § 1.07(a)(1) (" 'Act' means a bodily movement, whether voluntary or involuntary, and includes speech."), *with id.* § 1.07(a)(34) (" 'Omission' means failure to act."); *see also id.* § 6.01(a) (conditioning the existence of an offense on a voluntary "act" or "omission"). Instead of predicating the Board's enforcement authority on the existence of *any* legal violation, the legislature made

it dependent on the affirmative *commission of an act* that violates the law. If the legislature had wanted *any* violation of law to qualify as "unprofessional or dishonorable conduct likely to deceive or defraud the public," it could have dispensed with the words "commits an act **\*809** that." TEX. OCC. CODE § 164.053(a)(1). Indeed, that is exactly what it did in section 164.053(a)(7), which is triggered any time a physician "violates Section 311.0025, Health and Safety Code."

We should apply the statute's words whether they make perfect sense to us or not. *Centerpoint Builders GP v. Trussway, Ltd.*, 496 S.W.3d 33, 36 (Tex. 2016) ("[W]e may not omit or gloss over verbiage in an attempt to reclaim clarity."). But in this context, the legislature's invocation of the act-omission distinction actually seems quite sensible. The ancient common-law origins of the act-omission distinction derive in part from the concept of the *actus reus*, under which crimes at common law required proof of an overt act as opposed to a failure to act. 4 WILLIAM BLACKSTONE, COMMENTARIES \*21 ("[A] vicious will without a vicious act is no civil crime .... So that to constitute a crime against human laws, there must be, first, a vicious will; and, secondly, an unlawful act consequent upon such vicious will."). The act-omission distinction in criminal law, under which overt criminal acts traditionally were thought more blameworthy than omissions, may not be as strong now as it was in Blackstone's time. But it retains force today, at least enough for the legislature to invoke it in section 163.054(a)(1). Punishing overt acts that violate the law is one thing. Punishing failures to act—particularly in a profession where countless complicated federal and state regulations impose an unfathomable array of legal duties—is quite another. The statute's distinction between illegal acts and illegal omissions does not draw a perfect line between deceptive legal violations and innocuous ones, as the majority attempts to do. But it does draw a line, and we should enforce it.

In my view, section 164.053(a)(1) does not encompass the Board's allegations against Dr. Aleman, which stem from his unlawful failures to act, not from unlawful actions. Section 193.005(h), the statute Dr. Aleman admittedly violated, states: "The person completing the medical certification shall submit the information and attest to its validity using an electronic process approved by the state registrar." TEX. HEALTH & SAFETY CODE § 193.005(h). According to the Medical Board, Dr. Aleman's conduct falls within section 164.053(a)(1) because he violated section 193.005(h)

when he "admittedly *failed to sign* the [certificate of death] electronically." Resp't's Br. on the Merits 5 (emphasis added). The SOAH hearing officer stated in the Final Order that "Dr. Aleman violated Texas Health and Safety Code § 193.005(h) by *failing to certify* the death certificate for J.S. electronically." *Ruben Aleman, M.D.*, SOAH Docket No. 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.MD (Tex. Med. Bd. June 27, 2014) (emphasis added). The failure to sign is not an act. The failure to certify is not an act. They are omissions. The Board's complaint is that section 193.005(h) imposes an affirmative duty on Dr. Aleman, who *failed* to discharge it. Even as described by the Board and the hearing officer, Dr. Aleman's legal error was one of omission, not of commission. Dr. Aleman admits he violated the statute, but that does not mean he "committed an act that violated" it.

The only act Dr. Aleman committed was signing the death certificate with a pen. But section 193.005(h) does not prohibit that act. Again, it states: "The person completing the medical certification shall submit the information and attest to its validity using an electronic process approved by the state registrar." It says nothing one way or another about the legality of hand-signing a certificate that has been "dropped to paper" and thereby removed from the state registrar's electronic system. The statute does not make it illegal to hand-sign and then *later* electronically certify, as Dr. Aleman attempted to do. The **\*810** statute does not prohibit any action whatsoever with respect to a "dropped to paper" certificate. As far as section 193.005(h) is concerned, Dr. Aleman could have hand-signed it, thrown it in the trash, or made a paper airplane out of it. No matter what happened to the paper certificate, Dr. Aleman's only obligation under section 193.005(h) is to "submit the information and attest to its validity using an electronic process approved by the state registrar."

It might be argued that because hand-signing and electronically certifying are mutually exclusive methods, the act of hand-signing violates the duty to electronically certify. But the statute itself does not make the two options mutually exclusive. Only after consulting the jumbled innards of the "electronic process approved by the state registrar" could one know that, under the registrar-approved process, hand-signing and electronic certification happen to be mutually exclusive. But the "electronic process approved by the state registrar" is not "the law," so hand-signing in violation of it does not trigger section 164.053(a)(1). [1] And even if the "electronic process" were the law, the act of hand-signing a certificate still would not violate the statutory duty

to electronically certify. Under the state registrar-approved process, the option to hand-sign a paper certificate only arises after it has become impossible to electronically certify it. Once the certificate was "dropped to paper," hand-signing versus electronically signing was not an either/or proposition for Dr. Aleman. His options were to hand sign it or not hand sign it. Whether he took the overt act of signing the paper certificate or not, at that point he could not certify it electronically in compliance with section 193.005(h).

What made Dr. Aleman's violation of section 193.005(h) inevitable—and where the Board says he really went wrong—was his failure to register for the electronic certification system. Ultimately, the Board's objection to Dr. Aleman's conduct is not that he hand-signed the certificate *instead of* electronically certifying it. Once the certificate was "dropped to paper," he had no choice between the two methods.[2] In the end, the crux of the Board's objection is that the certificate had to be dropped to paper because Dr. Aleman was not registered with the electronic system. But the law contains no requirement that he register. And even if it did, by *failing* to **\*811** register he did not "*commit[ ] an act* that violates any state or federal law." TEX. OCC. CODE § 164.053(a)(1) (emphasis added).

The bottom line is that the Board is not prosecuting Dr. Aleman for what he did. It is prosecuting him for what he should have done. Under the Board's theory of this case, the legal violation to which Dr. Aleman admitted and for which he is being prosecuted is the *failure* to electronically certify a death certificate. Dr. Aleman may have violated the law by failing to certify electronically, but he did not thereby "commit[ ] an act that violates" the law. Under the text of section 164.053, his unlawful omission does not automatically qualify as "unprofessional or dishonorable conduct likely to deceive or defraud the public." The Board lacks authority to prosecute him for it. I concur in the Court's judgment vacating the sanctions against Dr. Aleman.

\* \* \*

After having thus taken each individual one by one into its powerful hands, and having molded him as it pleases, the sovereign power extends its arms over the entire society; it covers the surface of society with a network of small, complicated, minute, and uniform rules, which the most original minds and the most vigorous souls cannot break through to go beyond the crowd; it does not break wills, but it softens them, bends them and directs them; it rarely forces action, but it constantly opposes your acting; it

does not destroy, it prevents birth; it does not tyrannize, it hinders, it represses, it enervates, it extinguishes, it stupefies, and finally it reduces each nation to being nothing more than a flock of timid and industrious animals, of which the government is the shepherd.

ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA: HISTORICAL-CRITICAL EDITION 1252 (Eduardo Nolla ed., James T. Schleifer trans., Liberty Fund 2010).

Whether Tocqueville's darkly eloquent prophecy accurately describes modern America is in the eye of the beholder. Yet in at least one respect, his dystopic vision was undeniably prescient. More and more all the time, we live under a legal regime that "covers the surface of society with a network of small, complicated, minute, and uniform rules." *Id.* The total number of laws and regulations is staggering. The Code of Federal Regulations is nearly 190,000 pages long, and it grows constantly. CLYDE WAYNE CREWS, JR., TEN THOUSAND COMMANDMENTS: AN ANNUAL SNAPSHOT OF THE FEDERAL REGULATORY STATE 14 (2018). Since 1993, federal agencies have issued more than 101,380 rules. *Id.* at 4. "And no one seems sure how many more hundreds of thousands (or maybe millions) of pages of less formal or 'sub-regulatory' policy manuals, directives, and the like might be found floating around these days." *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 969 (10th Cir. 2016) (Gorsuch, J.). Even as far back as 1982, the Justice Department tried to count the total number of federal criminal laws but concluded that doing so with precision was futile. Gary Fields & John R. Emshwiller, *Many Failed Efforts to Count Nation's Federal Criminal Laws*, WALL ST. J., (July 23, 2011), https://on.wsj.com/2*o*KFAiM. In Texas law, there are over 43,000 regulations in the Administrative Code and over 4,000 chapters of statutory code, each of which contain dozens or even hundreds of sections. We can only guess at the total number of duties the law imposes on us. Like the grains of sand in a jar, their number seems beyond our capacity to count.

According to the Medical Board, the Texas Legislature designated any violation of any of the countless state or federal **\*812** statutory or regulatory legal obligations as "unprofessional or dishonorable conduct that is likely to deceive or defraud the public." TEX. OCC. CODE § 164.052(a)(5). If that is really the law, then perhaps reality is stranger than Tocqueville feared. Living under a network of complicated and minute rules may be our lot. Living under a regime that considers every violation of its complicated

and minute rules to be morally blameworthy—deceptive, fraudulent, and dishonorable—would be quite another thing. But that is not out fate. We remain free citizens endowed with moral discernment apart from the dictates of the law. Free people can tell the difference between laws that justly prohibit harmful conduct based on our shared sense of right and wrong and laws that outlaw otherwise innocuous behavior in pursuit of the government's innumerable regulatory goals. The notion that the Texas Legislature considers every minute violation of the myriad regulations under which doctors practice to be deceptive, fraudulent, and dishonorable conduct obviously strikes the majority of this Court as absurd. That is encouraging.

The ancient distinction between *malum in se* and *malum prohibitum* has deep roots in our legal tradition.[3] If we lose our sense of that distinction—between lawbreaking that is wrong in itself and lawbreaking that is wrong only because the government happens to have made it illegal—we are well on our way to becoming "nothing more than a flock of timid and industrious animals, of which the government is the shepherd."

Justice Boyd, dissenting.

In 2007, the legislature passed a statute requiring medical professionals to certify their patients' death certificates electronically instead of on paper. *See* TEX. HEALTH & SAFETY CODE § 193.005(h). To allow physicians ample time to register for and transition to this new system, the Medical Board declined to enforce the requirement for four-and-a-half years. The Board sent mass mailings notifying physicians of the new requirement and then notified them again when the grace period expired. Despite the statute and the notices, Dr. Ruben Aleman never registered to use the electronic-certification system during the extended grace period. One month after the grace period ended, he certified a patient's death certificate on paper. In response, the Board initiated a disciplinary action against Dr. Aleman for violating the law in connection with the practice of medicine.

It was a slam-dunk case. Dr. Aleman does not dispute that he certified the death certificate on paper rather than electronically. Predictably, the administrative law judge found that Dr. Aleman's failure to electronically certify the death certificate was a prohibited practice for which he was subject to discipline. The Board, the trial court, and the court of appeals unanimously **\*813** agreed. *Aleman v. Tex. Med. Bd.*, 565 S.W.3d 26, 28 (Tex. App.—Austin 2017).

But this Court does not. Purporting to "consider the context and framework of the entire statute" and "construe it as a whole" to "discern legislative intent," *ante* at 802 (quoting *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017)), the Court holds that the Board may discipline a doctor who commits an illegal act connected with the practice of medicine "only if the act is connected with the practice of medicine in a manner that makes it likely to deceive or defraud the public." *Ante* at 804.

Instead of "construing" the statute to divine some fictional "legislative intent,"[1] I would just apply the statute's plain and unambiguous language. The statute says the Board may discipline a doctor who "commits an act prohibited *under Section 164.052*." TEX. OCC. CODE § 164.051(a)(1) (emphasis added). Under section 164.052, a physician commits a prohibited act if the person "commits unprofessional or dishonorable conduct that is likely to deceive or defraud the public, *as provided by Section 164.053*." *Id.* § 164.052(a)(5) (emphasis added). And section 164.053 "provides" that, for "*purposes of Section 164.052(a)(5)*, unprofessional or dishonorable conduct likely to deceive or defraud the public *includes* conduct in which a physician ... commits an act that violates any state or federal law if the act is connected with the physician's practice of medicine." *Id.* § 164.053(a)(1) (emphases added).

At the risk of proving F. Scott Fitzgerald's point,[2] I (at least keeping good company with the administrative law judge, the Board, the trial court, and the unanimous court of appeals) find all this pretty simple:

- the Board can discipline a doctor who commits unprofessional or dishonorable conduct that is likely to deceive or defraud the public;

- such conduct "includes" an illegal act connected with the practice of medicine; and

- Dr. Aleman committed an illegal act connected with the practice of medicine; so

- the Board can discipline Dr. Aleman.

When the statute expressly classifies particular conduct as "unprofessional or dishonorable conduct likely to deceive or defraud the public," the Court's disagreement with that classification is irrelevant. As we have said time and again, "when a statute provides a definition for or uses a **\*814** word

or phrase in a particular manner, then courts *must* apply that definition or manner of use when interpreting the statute." *PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 556 (Tex. 2015) (emphasis added). [3]

Purporting to construe the statute "as a whole" instead of "favoring microscopic examination of isolated words," the Court concludes that the statute simply cannot mean what it expressly says. *Ante* at 804. Specifically, the Court concludes that conduct that qualifies as conduct "likely to deceive or defraud the public" does not in fact "include" the conduct the statute says it includes, but instead includes such conduct only if it is in fact likely to deceive or defraud the public. *Ante* at 804–05. But it "is very rare that a defined meaning can be replaced with another permissible meaning of the word on the basis of other textual indications; the definition is virtually conclusive." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 228 (2012) [hereinafter READING LAW]. And we need not microscopically examine any isolated words to conclude that conduct for which the Board may discipline a doctor "includes" illegal conduct connected with the practice of medicine. Because the statute expressly says it does, the Court's contrary conclusion is simply "disloyal to [the] enacted text." *Youngkin*, 546 S.W.3d at 681.

As additional support for its holding, the Court asserts that the "finite list of acts" under section 164.053(a) narrows the scope of conduct that qualifies as "unprofessional or dishonorable conduct likely to deceive or defraud the public" under section 164.052(a)(5). *Ante* at 805. It reasons that the Board's reading of section 164.053(a)(1) "broadens that scope" and thus "ignores the Legislature's choice to categorize the conduct in the first instance." *Ante* at 804. **\*815** This reasoning fails for two independent reasons.

First, it misapplies the *noscitur a sociis* canon on which it relies *sub silentio*. This canon "directs that similar terms be interpreted in a similar manner." *TGS-NOPEC*, 340 S.W.3d at 441. More specifically, when words "are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." READING LAW at 195. Specific items within a list may limit the meaning of a more general term within the same list "to a subset of all the things or actions that [the more general term] covers—but only according to its ordinary meaning." *Id.* at 196.

The Court concludes that the statute's reference to illegal acts connected with the practice of medicine must refer only to such acts that are connected with the practice of medicine "in a manner that makes [them] likely" deceptive or fraudulent, because all the other items in the list fit that description. *Ante* at 804–06. To begin with, that characterization simply isn't true: failing to adequately supervise a subordinate is not necessarily likely to deceive or defraud the public, *see* TEX. OCC. CODE § 164.053(a)(8), nor is writing a prescription for a known narcotic abuser or prescribing a nontherapeutic treatment, *see id.* §§ 164.053(a)(3), (5). Under the Court's construction, the Board could discipline a doctor for engaging in *any* of the listed conduct *only* if the Board demonstrates that the doctor's particular actions were likely to deceive or defraud the public. The statute, however, imposes no such requirement.

But beyond that, the Court misapplies the *noscitur a sociis* canon by focusing on the narrowest possible commonality among the listed items. When the canon applies, the "common quality" among the items listed "should be its *most general* quality—the *least* common denominator, so to speak—relevant to the context." READING LAW at 196 (emphases added). To use the Court's example, *see ante* at 805, the canon might justify construing the statute's reference to illegal acts "connected with the practice of medicine" to *not* include a doctor's speeding on the way to the hospital, because the types of acts listed share the "general quality" of improper acts performed *as a physician*, not *as a driver*. But whether that's true or not, no one disputes that Dr. Aleman's failure to certify the death certificate electronically was improper and connected with the practice of medicine and, in that sense, it fits squarely within the "general quality" the other listed items share.

Second, and more concerning, the Court's reasoning ignores—and effectively deletes—the statute's unambiguous language. According to the Court, the statute's reference to illegal acts connected with the practice of medicine must refer only to such acts that are "connected with the practice of medicine in a manner that makes [them] likely to deceive or defraud the public" because, "otherwise, categorizing the conduct at all serves no purpose." *Ante* at ——. To the contrary, by "categorizing" actionable conduct as all unprofessional or dishonorable acts likely to deceive or defraud the public, and then defining *that category* to include a *non-exclusive* list of specific types of conduct, the statute confirms that the category includes both the listed conduct and all other unspecified conduct that fits

within the broad category. In other words, by stating that the generally described conduct "includes" the listed conduct, the statute does not create a "finite list of acts" at all. *See*TEX. GOV'T CODE § 311.005(13) (" 'Includes' and 'including' are terms of enlargement and not of limitation **\*816** or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded.").

That one listed item does not seem *to us* to fit neatly within the general category's description does not grant us license to remove or revise that item. We have no authority "to rewrite the statute so that it covers only what *we think* is necessary to achieve what *we think* [the legislature] really intended." *Lewis v. City of Chicago*, 560 U.S. 205, 215, 130 S.Ct. 2191, 176 L.Ed.2d 967 (2010) (emphases added); *see also*Badaracco v. Comm'r of Internal Revenue, 464 U.S. 386, 398, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."). The Court does not think that all illegal conduct connected with the practice of medicine constitutes "unprofessional or dishonorable conduct likely to deceive or defraud the public," so it rewrites the statute to include only those illegal acts that it thinks fit that description. But it ignores the statute's express statement that the general category "includes" illegal conduct connected with the practice of medicine, whether we think it should or not.

And there's more. If, as the Court concludes, the statute allows the Board to discipline doctors only for conduct that is "likely to deceive or defraud the public," there'd be no reason for the list of "included" conduct at all. Under the Court's approach, every act that clearly fits that description is actionable, every act that does not clearly fit that description is not actionable, and the list of acts that the statute says are "included" within

the description is simply meaningless. But by providing the list of "included" conduct, the statute provides that all such "included" conduct is actionable even if we think it doesn't clearly fit the description.

Contrary to the Court's reasoning, the correct approach is to recognize that, by describing a general category and then listing specific conduct "included" within that category, the statute makes "doubly sure that the broad (and intended-to-be-broad) general term is taken to include the specifics." READING LAW at 204 (noting that some statutes, like the one at issue here, "provide this belt-and-suspenders function by introducing the specifics with a term such as *including* or even *including without limitation*"). The statute expressly provides that the category of prohibited conduct for which a physician may be disciplined—however that category may be described—"includes" illegal conduct connected with the practice of medicine. Because Dr. Aleman's failure to comply with the electronic-certification statute amounts to such conduct, the statute authorizes the Board to discipline him.

Because the statute expressly grants the Board authority to discipline Dr. Aleman for violating the electronic-certification statute, I respectfully dissent.[4] Like the **\*817** unanimous court of appeals, the trial court, the Board, and the administrative law judge, I would hold that the Board acted within its authority, Dr. Aleman cannot rely on an impossibility defense, and the Board did not abuse its discretion. I would affirm.

**All Citations**

573 S.W.3d 796, 62 Tex. Sup. Ct. J. 1108

---

**Footnotes**

1     The Act allows other designated physicians to complete the medical certification if the attending physician is unavailable and other requirements are met. TEX. HEALTH & SAFETY CODE § 193.005(c). And in 2017, the Legislature amended the Act to allow a physician assistant or advanced practice registered nurse to complete the certification for certain patients receiving hospice services and palliative care. Act of May 30, 2017, 85th Leg., R.S., ch. 509, § 1, 2017 Tex. Gen. Laws 1343, 1343–44 (codified at TEX. HEALTH & SAFETY CODE § 193.005(a-1)).

The Act requires the person completing the medical certification to notify the funeral director of the reason for delay if the certification cannot be completed in a timely manner. TEX. HEALTH & SAFETY CODE § 193.005(g).

If the person required to file the certificate is licensed by a state agency, the Act prohibits the agency from taking "disciplinary action against the person for failure to timely file the certificate if the person supplies written documentation that the person has made a good faith effort to [timely] file ... and the failure to [do so] results from circumstances beyond the person's control." *Id.* § 193.0041.

According to the Department's website, a new registration system called Texas Electronic Vital Events Registrar (TxEVER) went live on January 1, 2019, replacing TEDR and the corresponding system for preparing and recording birth certificates. *See* https://dshs.texas.gov/vs/field/The-TxEVER-Project/.

After the electronic certification requirement went into effect in September 2007, the Board observed a grace period until June 1, 2011, refraining from taking disciplinary action against physicians who failed to comply with the requirement during that period. The events involving Dr. Aleman occurred shortly after the grace period expired.

"Practicing medicine" is defined as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a [physician]." TEX. OCC. CODE § 151.002(13).

We disagree with the court of appeals and the dissent that the Act internally defines the term "unprofessional or dishonorable conduct likely to deceive or defraud the public." Rather, the Legislature has enumerated in section 164.053 a number of practices that are encompassed by that classification, including acts that violate state law and are connected with the physician's practice of medicine.

The dissent opines that failing to adequately supervise subordinates, writing prescriptions for known narcotic abusers, and prescribing nontherapeutic treatments do not necessarily constitute conduct that is likely to deceive or defraud the public. *Post* at 815. We disagree. Failing to supervise subordinates gives patients a false sense of that person's authority and control, and prescribing drugs to narcotic abusers or prescribing nontherapeutic treatments gives others the false impression that the drug or treatment is appropriate.

The concurrence would hold that Dr. Aleman's conduct does not satisfy section 164.053(a)(1) because the statute requires the affirmative commission of an act, and Dr. Aleman is being accused only of failing to act—specifically, failing to certify electronically. *Post* at 811. We do not view the statute so narrowly. Leaving aside that almost any conduct can be characterized as both acting and failing to act depending on how it is presented—for example, running a stop sign vs. failing to stop at a stop sign—the allegations against Dr. Aleman are premised on his actions. The Board alleged, and the ALJ found, that Dr. Aleman certified J.S.'s death certificate manually in contravention of the Health and Safety Code's requirement that he do so electronically. In other words, the complained-of conduct involves the manner in which Dr. Aleman certified the death certificate, which is an affirmative act.

Each local registrar is required to send all registered birth and death certificates to the state registrar on a monthly basis. TEX. HEALTH & SAFETY CODE § 191.029. The state registrar must "arrange, bind, and permanently preserve [the certificates] in a systematic manner." *Id.* § 191.032.

The dissent implies that we have imposed our own subjective view of what fits within the category's description. *Post* at 816. But not even the Board argues that the conduct at issue does so. Instead, it (and the dissent) argue that we should ignore the language the Legislature chose to describe this category altogether.

12 The dissent accuses the Court of rewriting the statute to avoid what we perceive as a troubling result. *Post* at 816. To the contrary, we interpret the statute as a whole and in context to conclude that the *Legislature* intended to avoid this result. *Melden & Hunt, Inc. v. E. Rio Hondo Water Supply Corp.*, 520 S.W.3d 887, 893 (Tex. 2017) ("[T]he truest measure of what the Legislature intended is what it enacted.").

13 Dr. Aleman alternatively argues that any violation of the electronic certification requirement was excused because it was impossible for him to certify J.S.'s death certificate electronically after it was dropped to paper without his knowledge by the funeral director. He also argues that, to the extent sanctions were authorized, the particular sanction imposed by the Board was so severe as to constitute an abuse of discretion. In light of our holding that Dr. Aleman did not violate the Medical Practice Act, we need not reach these issues.

1 We are directed to no formally promulgated regulation containing this "process." The Board describes the process based on witness testimony from state employees familiar with its inner workings, not based on citations to legal authority. If, as the Board seems to argue, the legislature outlawed whatever the state registrar-approved process would later happen to prohibit, then section 193.005(h) could fail a constitutional challenge under non-delegation principles. Article II, Section 1 of the Texas Constitution, our state's separation-of-powers clause, has been understood to prohibit the legislature from delegating to executive branch agencies the authority to make law. TEX. CONST. art. II, § 1; *Brown v. Humble Oil & Ref. Co.*, 126 Tex. 296, 83 S.W.2d 935, 941 (1935) ("The power to pass laws rests with the Legislature, and that power cannot be delegated to some commission or other tribunal."); *Chancy v. State*, 84 Tex. 529, 19 S.W. 706, 709 (1892) ("Laws can be made in this state only by the legislature, and it has no power to delegate to any board or other department of the government the power to annul laws enacted by it.").

2 Although Dr. Aleman does not couch his statutory arguments in the text's distinction between acts and omissions, his statutory arguments implicate similar concerns by stressing the "impossibility" of complying with the statute after the certificate had been "dropped to paper." He essentially argues that he can't have *done* anything wrong because once the certificate was "dropped to paper" he did not have the option to *do* anything right. He is correct.

3 1 WILLIAM BLACKSTONE, COMMENTARIES *54–55, ("[D]ivine or natural *duties* ... [do not] receive any stronger sanction from being also declared to be duties by the law of the land. The case is the same as to crimes and misdemeanors, that are forbidden by the superior laws, and therefore styled *mala in se*, such as murder, theft, and perjury; which contract no additional turpitude from being declared unlawful by the inferior legislature. For that legislature in all these cases acts only ... in subordination to the great lawgiver, transcribing and publishing his precepts. So that, upon the whole, the declaratory part of the municipal law has no force or operation at all, with regard to actions that are naturally and intrinsically right or wrong. But, with regard to things in themselves indifferent, the case is entirely altered. These become either right or wrong, just or unjust, duties or misdemeanors, according as the municipal legislator sees proper ....").

1 *See, e.g.*, *Lawson v. FMR LLC*, 571 U.S. 429, 460, 134 S.Ct. 1158, 188 L.Ed.2d 158 (2014) (Scalia, J., concurring) ("Since congressional 'intent' apart from enacted text is fiction to begin with, courts understandably allow themselves a good deal of poetic license in defining it."); *Bank One Chicago, N.A. v. Midwest Bank & Tr. Co.*, 516 U.S. 264, 279, 116 S.Ct. 637, 133 L.Ed.2d 635 (1996) (Scalia, J., concurring) ("The law *is* what the law *says*, and we should content ourselves with reading it rather than psychoanalyzing those who enacted it."); *Sherman v. United States*, 356 U.S. 369, 381, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring) (referring to "wholly fictitious congressional intent"); *Tex. Dep't of Pub. Safety v. LaFleur*, 32 S.W.3d 911, 915 n.7 (Tex. App.—Texarkana 2000, no pet.) ("Legislative intent is, in a sense, a legal fiction because it requires the courts to ascertain the intent of all of the voting members of the legislative body. There is no way to know what all members of the Legislature believed any given bill might mean.");

Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 68 (1994) ("Intent is elusive for a natural person, fictive for a collective body.").

2     F. SCOTT FITZGERALD, THE GREAT GATSBY 79 (Wordsworth Editions Ltd. 1993) ("There is no confusion like the confusion of a simple mind.").

3     *See also Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 894 (Tex. 2018) ("[W]e must adhere to statutory definitions.") (citing *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("If a statute uses a term with a particular meaning or assigns a particular meaning to a term, we are bound by the statutory usage.")); *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018) ("Courts must adhere to legislative definitions of terms when they are supplied.") (citing TEX. GOV'T CODE § 311.001(b)); *Melden & Hunt, Inc. v. E. Rio Hondo Water Supply Corp.*, 520 S.W.3d 887, 893 (Tex. 2017) ("We also typically give statutory terms their ordinary or common meaning unless ... a supplied definition indicates that a different meaning was intended.") (citing *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 765 (Tex. 2014) ("We rely on the plain meaning of the text as expressing legislative intent unless a different meaning is supplied by legislative definition ....")); *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 46 (Tex. 2015) ("[W]e initially limit our statutory review to the plain meaning of the text as the sole expression of legislative intent ... unless the Legislature has supplied a different meaning by definition ....") (internal citations omitted); *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 501 (Tex. 2015) ("We construe a statute's words according to their plain and common meaning unless they are statutorily defined otherwise ...."); *In re Ford Motor Co.*, 442 S.W.3d 265, 271 (Tex. 2014) (orig. proceeding) ("We presume that a definition of a common word accords with and does not conflict with the ordinary meaning unless the language clearly indicates otherwise."); *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 636 (Tex. 2013) ("If a term is expressly defined by statute we must follow that definition.") (citing TEX. GOV'T CODE § 311.001(b)); *City of Waco v. Kelley*, 309 S.W.3d 536, 542 (Tex. 2010) ("If the Legislature provides definitions for words it uses in statutes, then we use those definitions in our task."); *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002) ("[I]f a statute defines a term, a court is bound to construe that term by its statutory definition only."); *Tijerina v. City of Tyler*, 846 S.W.2d 825, 827 (Tex. 1992) ("Statutory definitions must be given effect; ordinary meanings should be applied *only* to undefined terms.") (emphasis added).

4     Dr. Aleman alternatively argues that it was "impossible" for him to electronically certify the death certificate, given that he had not yet registered to use the system, and that the Board abused its discretion by imposing arbitrary and capricious penalties. For the reasons the court of appeals explained, I would reject both arguments. Dr. Aleman cannot rely on an impossibility "of his own making—his failure to register with the [electronic system] until August 2011." 565 S.W.3d at 35. And the Board's penalties fell well below the maximum its rules allowed for contested cases. *See* 22 TEX. ADMIN. CODE § 190.14(4) ("The maximum sanction in all cases is revocation of the licensee's license, which may be accompanied by an administrative penalty of up to $ 5,000 per violation."). I do not disagree with the Court's holding that the Board's complaint against Dr. Aleman met all statutory requirements and that Dr. Aleman was not entitled to attorney's fees in the administrative proceedings. *See ante* at 807, 808.

---

# Tab D

Vernon's Texas Statutes and Codes Annotated
  Occupations Code (Refs & Annos)
    Title 3. Health Professions (Refs & Annos)
      Subtitle B. Physicians (Refs & Annos)
        Chapter 164. Disciplinary Actions and Procedures
          Subchapter B. License Denial and Disciplinary Actions

V.T.C.A., Occupations Code § 164.051

§ 164.051. Grounds for Denial or Disciplinary Action

Currentness

(a) The board may refuse to admit a person to its examination or refuse to issue a license to practice medicine and may take disciplinary action against a person if the person:

(1) commits an act prohibited under Section 164.052;

(2) is convicted of, or is placed on deferred adjudication community supervision or deferred disposition for:

(A) a felony; or

(B) a misdemeanor involving moral turpitude;

(3) commits or attempts to commit a direct or indirect violation of a rule adopted under this subtitle, either as a principal, accessory, or accomplice;

(4) is unable to practice medicine with reasonable skill and safety to patients because of:

(A) illness;

(B) drunkenness;

(C) excessive use of drugs, narcotics, chemicals, or another substance; or

(D) a mental or physical condition;

(5) is found by a court judgment to be of unsound mind;

(6) fails to practice medicine in an acceptable professional manner consistent with public health and welfare;

(7) is removed, suspended, or is subject to disciplinary action taken by the person's peers in a local, regional, state, or national professional medical association or society, or is disciplined by a licensed hospital or medical staff of a hospital, including removal, suspension, limitation of hospital privileges, or other disciplinary action, if the board finds that the action:

(A) was based on unprofessional conduct or professional incompetence that was likely to harm the public; and

(B) was appropriate and reasonably supported by evidence submitted to the board;

(8) is subject to repeated or recurring meritorious health care liability claims that in the board's opinion evidence professional incompetence likely to injure the public; or

(9) except as provided by Subsections (d) and (e), holds a license to practice medicine subject to disciplinary action by another state, or subject to disciplinary action by the uniformed services of the United States, based on acts by the person that are prohibited under Section 164.052 or are similar to acts described by this subsection.

(b) Action taken by a professional medical association, society, or hospital medical staff under Subsection (a)(7) does not constitute state action.

(c) A certified copy of the record of another state that takes action described by Subsection (a)(9) or (d) is conclusive evidence of that action.

(d) The board shall refuse to issue a license under this subtitle if the applicant held a license to practice medicine in another state that has been revoked by the licensing authority in that state for a reason that would be grounds for the board to revoke a license to practice medicine in this state.

(e) The board shall revoke a license issued under this subtitle if the license holder, while holding the license under this subtitle, held a license to practice medicine in another state that has been revoked by the licensing authority in that state for a reason that would be grounds for the board to revoke a license to practice medicine in this state.

**Credits**
Acts 1999, 76th Leg., ch. 388, § 1, eff. Sept. 1, 1999. Amended by Acts 2003, 78th Leg., ch. 202, § 31, eff. June 10, 2003; Acts 2023, 88th Leg., ch. 827 (H.B. 1998), § 10, eff. Sept. 1, 2023.

V. T. C. A., Occupations Code § 164.051, TX OCC § 164.051
Current through legislation effective June 12, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Tab E

Vernon's Texas Statutes and Codes Annotated
    Occupations Code (Refs & Annos)
        Title 3. Health Professions (Refs & Annos)
            Subtitle B. Physicians (Refs & Annos)
                Chapter 164. Disciplinary Actions and Procedures
                    Subchapter B. License Denial and Disciplinary Actions

V.T.C.A., Occupations Code § 164.052

§ 164.052. Prohibited Practices by Physician or License Applicant

Currentness

(a) A physician or an applicant for a license to practice medicine commits a prohibited practice if that person:

(1) submits to the board a false or misleading statement, document, or certificate in an application for a license;

(2) presents to the board a license, certificate, or diploma that was illegally or fraudulently obtained;

(3) commits fraud or deception in taking or passing an examination;

(4) uses alcohol or drugs in an intemperate manner that, in the board's opinion, could endanger a patient's life;

(5) commits unprofessional or dishonorable conduct that is likely to deceive or defraud the public, as provided by Section 164.053, or injure the public;

(6) uses an advertising statement that is false, misleading, or deceptive;

(7) advertises professional superiority or the performance of professional service in a superior manner if that advertising is not readily subject to verification;

(8) purchases, sells, barters, or uses, or offers to purchase, sell, barter, or use, a medical degree, license, certificate, or diploma, or a transcript of a license, certificate, or diploma in or incident to an application to the board for a license to practice medicine;

(9) alters, with fraudulent intent, a medical license, certificate, or diploma, or a transcript of a medical license, certificate, or diploma;

(10) uses a medical license, certificate, or diploma, or a transcript of a medical license, certificate, or diploma that has been:

    (A) fraudulently purchased or issued;

    (B) counterfeited; or

    (C) materially altered;

(11) impersonates or acts as proxy for another person in an examination required by this subtitle for a medical license;

(12) engages in conduct that subverts or attempts to subvert an examination process required by this subtitle for a medical license;

(13) impersonates a physician or permits another to use the person's license or certificate to practice medicine in this state;

(14) directly or indirectly employs a person whose license to practice medicine has been suspended, canceled, or revoked;

(15) associates in the practice of medicine with a person:

    (A) whose license to practice medicine has been suspended, canceled, or revoked; or

    (B) who has been convicted of the unlawful practice of medicine in this state or elsewhere;

(16) performs or procures a criminal abortion, aids or abets in the procuring of a criminal abortion, attempts to perform or procure a criminal abortion, or attempts to aid or abet the performance or procurement of a criminal abortion;

(17) directly or indirectly aids or abets the practice of medicine by a person, partnership, association, or corporation that is not licensed to practice medicine by the board;

(18) performs an abortion on a woman who is pregnant with a viable unborn child during the third trimester of the pregnancy unless:

    (A) the abortion is necessary to prevent the death of the woman;

    (B) the viable unborn child has a severe, irreversible brain impairment; or

    (C) the woman is diagnosed with a significant likelihood of suffering imminent severe, irreversible brain damage or imminent severe, irreversible paralysis;

(19) performs an abortion on an unemancipated minor without the written consent of the child's parent, managing conservator, or legal guardian or without a court order, as provided by Section 33.003 or 33.004, Family Code, unless the abortion is necessary due to a medical emergency, as defined by Section 171.002, Health and Safety Code;

(20) otherwise performs an abortion on an unemancipated minor in violation of Chapter 33, Family Code;

(21) performs or induces or attempts to perform or induce an abortion in violation of Subchapter C, F, or G, Chapter 171, Health and Safety Code;

(22) in complying with the procedures outlined in Sections 166.045 and 166.046, Health and Safety Code, wilfully fails to make a reasonable effort to transfer a patient to a physician who is willing to comply with a directive;

(23) performs or delegates to another individual the performance of a pelvic examination on an anesthetized or unconscious patient in violation of Section 167A.002, Health and Safety Code; or

(24) performs a gender transitioning or gender reassignment procedure or treatment in violation of Section 161.702, Health and Safety Code.

(b) For purposes of Subsection (a)(12), conduct that subverts or attempts to subvert the medical licensing examination process includes, as prescribed by board rules, conduct that violates:

(1) the security of the examination materials;

(2) the standard of test administration; or

(3) the accreditation process.

(c) The board shall adopt the forms necessary for physicians to obtain the consent required for an abortion to be performed on an unemancipated minor under Subsection (a). The form executed to obtain consent or any other required documentation must be retained by the physician until the later of the fifth anniversary of the date of the minor's majority or the seventh anniversary of the date the physician received or created the documentation for the record.

**Credits**

Acts 1999, 76th Leg., ch. 388, § 1, eff. Sept. 1, 1999. Amended by Acts 2005, 79th Leg., ch. 269, § 1.42, eff. Sept. 1, 2005; Acts 2013, 83rd Leg., 2nd C.S., ch. 1 (H.B. 2), § 6, eff. Oct. 29, 2013; Acts 2015, 84th Leg., ch. 436 (H.B. 3994), § 13, eff. Jan. 1, 2016; Acts 2017, 85th Leg., ch. 441 (S.B. 8), § 14, eff. Sept. 1, 2017; Acts 2019, 86th Leg., ch. 1231 (H.B. 1504), § 16, eff. Sept. 1, 2019; Acts 2021, 87th Leg., ch. 251 (H.B. 1434), § 2, eff. Sept. 1, 2021; Acts 2023, 88th Leg., ch. 335 (S.B. 14), § 4, eff. Sept. 1, 2023.

V. T. C. A., Occupations Code § 164.052, TX OCC § 164.052

Current through legislation effective June 12, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Tab F

Vernon's Texas Statutes and Codes Annotated
  Occupations Code (Refs & Annos)
    Title 3. Health Professions (Refs & Annos)
      Subtitle B. Physicians (Refs & Annos)
        Chapter 164. Disciplinary Actions and Procedures
          Subchapter B. License Denial and Disciplinary Actions

V.T.C.A., Occupations Code § 164.053

§ 164.053. Unprofessional or Dishonorable Conduct

Currentness

(a) For purposes of Section 164.052(a)(5), unprofessional or dishonorable conduct likely to deceive or defraud the public includes conduct in which a physician:

(1) commits an act that violates any state or federal law if the act is connected with the physician's practice of medicine;

(2) fails to keep complete and accurate records of purchases and disposals of:

(A) drugs listed in Chapter 481, Health and Safety Code; or

(B) controlled substances scheduled in the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. Section 801 et seq.);

(3) writes prescriptions for or dispenses to a person who:

(A) is known to be an abuser of narcotic drugs, controlled substances, or dangerous drugs; or

(B) the physician should have known was an abuser of narcotic drugs, controlled substances, or dangerous drugs;

(4) writes false or fictitious prescriptions for:

(A) dangerous drugs as defined by Chapter 483, Health and Safety Code; or

(B) controlled substances scheduled in Chapter 481, Health and Safety Code, or the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. Section 801 et seq.);

(5) prescribes or administers a drug or treatment that is nontherapeutic in nature or nontherapeutic in the manner the drug or treatment is administered or prescribed;

(6) prescribes, administers, or dispenses in a manner inconsistent with public health and welfare:

(A) dangerous drugs as defined by Chapter 483, Health and Safety Code; or

(B) controlled substances scheduled in Chapter 481, Health and Safety Code, or the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. Section 801 et seq.);

(7) violates Section 311.0025, Health and Safety Code;

(8) fails to supervise adequately the activities of those acting under the supervision of the physician; or

(9) delegates professional medical responsibility or acts to a person if the delegating physician knows or has reason to know that the person is not qualified by training, experience, or licensure to perform the responsibility or acts.

(b) A complaint, indictment, or conviction of a violation of law is not necessary for the enforcement of Subsection (a)(1). Proof of the commission of the act while in the practice of medicine or under the guise of the practice of medicine is sufficient for the board's action.

(c) Subsection (a)(3) does not apply to a person the physician is treating for:

(1) the person's use of narcotics after the physician notifies the board in writing of the name and address of the person being treated; or

(2) intractable pain under the Intractable Pain Treatment Act (Article 4495c, Revised Statutes).

**Credits**
Acts 1999, 76th Leg., ch. 388, § 1, eff. Sept. 1, 1999. Amended by Acts 2001, 77th Leg., ch. 1420, § 14.034(a), eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 202, § 32, eff. June 10, 2003.

V. T. C. A., Occupations Code § 164.053, TX OCC § 164.053
Current through legislation effective June 12, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lauren Hawthorne on behalf of Hayley Ellison
Bar No. 24074175
lhawthorne@dslawpc.com
Envelope ID: 102632661
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Appellant's Brief
Status as of 7/1/2025 10:51 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason M.Davis | | jdavis@dslawpc.com | 7/1/2025 10:47:50 AM | SENT |
| Ted Ross | 24008890 | Ted.Ross@oag.texas.gov | 7/1/2025 10:47:50 AM | SENT |
| Jeff Lutz | | jeff.lutz@oag.texas.gov | 7/1/2025 10:47:50 AM | SENT |
| Hayley Ellison | | hellison@dslawpc.com | 7/1/2025 10:47:50 AM | SENT |
| Katherine Johnson | 24126964 | kathy.johnson@oag.texas.gov | 7/1/2025 10:47:50 AM | SENT |